TRIBUNE COMPANY *et al.*, Plaintiffs-Appellants, v. ALLSTATE INSURANCE COMPANY, Successor by Merger to Northbrook Excess and Surplus Insurance Company, formerly Northbrook Insurance Company, *et al.*, Defendants-Appellees.

First District (2nd Division)  No. 1—97—2264

Opinion filed April 20, 1999.—Modified on denial of rehearing August 10, 1999.

Jones, Day, Reavis & Pogue, of Chicago (Paul W. Schroeder and Anastasia Katinas, of counsel), for appellants.

Caron, McCormick, Constants & Goldberg, of Chicago (Nancy K. Caron and Mariola K. Weithers, of counsel), for appellee American Insurance Company.

Cohn & Baughman, of Chicago (William M. Cohn and Michael R. Orlando, of counsel), for appellee Insurance Company of North America.

Bates, Meckler, Bulger & Tilson, of Chicago (Michael M. Marick and Frederick W. Stein, of counsel), for appellee Zurich Insurance Company.

John Y.E. Lee and Michael A. Chabraja, both of Oppenheimer, Wolff & Donnelly, of Chicago, for appellees American Reinsurance Company and Executive Re Indemnity Inc.

David E. Trainor and Brett L. Warning, both of Tressler, Soderstrom, Maloney & Priess, of Chicago, for appellee Allstate Insurance Company.

David E. Neumeister, James K. Horstman, Douglas W. Lohmar, and Lloyd E. Williams, Jr., all of Williams & Montgomery, for appellee The Home Insurance Company.

James F. Martin, of Skadden, Arps, Slate, Meagher & Flom, of Chicago, for appellee North Star Reinsurance Corporation.

Christopher R. Barth and Adam H. Fleischer, both of Blatt, Hammesfahr & Eaton, of Chicago, for appellee Certain Underwriters of Lloyd's of London.

Michael J. Sehr, of Fedota, Childers & Rocca, of Chicago, for appellees Continental Casualty Company and Columbia Casualty Company.

Michael Patrizio, of Dowd & Dowd, of Chicago, for appellee Associated International Insurance Company.

Jeffrey L. Kaser, of Burditt & Radzius, Chartered, of Chicago, and Michael D. Gallagher, Jeffery N. German, and Michael K. Willison, all of German, Gallagher & Murtagh, of Philadelphia, Pennsylvania, for appellee Stonewall Insurance Company.

Wayne S. Karbal, of Vedder, Price, Kaufman & Kammholz, of Chicago, for appellee First State Insurance Company.

Jeffrey E. Margulis, of Lovell White Durrant, of Chicago, and Richard M. Hagstrom and Daniel S. Weiss, both of Zelle & Larson, LLP, of Minneapolis, Minnesota, for appellee Employers Insurance of Wausau.

James T. Ferrini, Ilene M. Korey, and Melinda S. Kollross, all of Clausen, Miller, P.C., of Chicago, for appellee Lexington Insurance Company.

JUSTICE McNULTY delivered the opinion of the court:

Three parties filed separate lawsuits against Sentinel Communications Company, a subsidiary of Tribune Company. After Tribune and Sentinel sent notice of the lawsuits to their primary and excess general liability insurers, the insurers denied responsibility for defense of the suits or indemnification of Tribune and Sentinel. Tribune and Sentinel then sued all of their general liability insurers, seeking a

judgment declaring the responsibilities of the insurers to the plaintiffs under the insurance policies. The trial court granted two primary insurers summary judgment on all claims against them, finding that their contracts imposed no duty to defend or indemnify plaintiffs in any of the three suits filed against them. The court granted all insurers summary judgment on all claims related to one of the three suits, due to late notice. Plaintiffs filed a timely appeal. This court has jurisdiction pursuant to Supreme Court Rule 304(a). 155 Ill. 2d R. 304(a).

On July 10, 1992, Robert Hester sued Sentinel for allegedly contaminating the soil of Hester's property with petroleum products. The Florida Department of Environmental Regulation (FDER) sent Sentinel a warning letter on July 24, 1992, advising Sentinel of FDER's investigation into the source of trichloroethene (TCE) found in groundwater near Sentinel's property. FDER later filed a suit against Sentinel related to TCE contamination.

On September 23, 1992, plaintiffs sent notice of the warning letter and the lawsuit Hester filed to their primary general liability insurers for the years 1975 through 1985. From 1975 until early 1980, Zurich Insurance Company provided primary coverage.

During 1980 Tribune began a program by which it purchased at a very low price general liability insurance policies in which the primary insurer's limits of liability matched the deductible. The Tribune's risk manager explained that under such a "fronting" or "matching deductible" policy, the insurer's affiliate provided claims handling services, but the policyholder effectively insured itself up to the primary policy's limits. With these policies the insured could set some of the terms and conditions for the excess insurance, and the insured could obtain necessary certificates of insurance in a cost-effective manner.

From 1980 through 1982, Tribune purchased as its primary coverage matching deductible policies from Insurance Company of North America (INA); from 1983 through 1985 American Insurance Company provided the matching deductible primary insurance.

Tribune purchased excess or umbrella insurance from at least 13 different insurers for various years between 1975 and 1985. When plaintiffs notified their primary insurers of the Hester suit and the FDER warning letter, they also sent notice to all excess general liability insurers.

Cheney Street, Inc., filed suit against Sentinel on November 30, 1992, alleging that Sentinel's activities caused TCE contamination of the soil and groundwater of Cheney Street's property. Plaintiffs sent notice of the suit to all their primary and excess general liability insurers on December 8, 1992.

Zurich sent plaintiffs a letter requesting more information so that

Zurich could determine whether it had a duty to defend the lawsuits. Zurich reserved the right to dispute coverage pending the outcome of the investigation. All other insurers denied coverage. On February 17, 1994, plaintiffs filed this suit for a judgment declaring the insurers had a duty to indemnify them for any judgment in favor of Hester, Cheney Street or FDER. Plaintiffs also sought specific performance of the duty to defend.

The insurers filed a flurry of motions for summary judgment, most insurers joining motions other insurers filed. All insurers moved to dismiss the complaint for coverage related to the Hester suit on grounds of late notice. They supported the motion with documents showing that Sentinel employees knew of its potential liability for years before providing notice to the insurers.

Plaintiffs admitted that by May 1990 Sentinel knew that Exxon, which owned neighboring property, had retained an environmental consultant, and after that consultant conducted tests, Exxon blamed Sentinel for petroleum contamination. On June 5, 1990, Sentinel contacted an attorney regarding the allegations of petroleum contamination, and Sentinel later retained an environmental consultant. Sentinel's consultant also found petroleum contamination, but it reported Exxon as the most likely source of the oil. The consultant acknowledged the possibility of contamination due to release of petroleum from a source on Sentinel's property, for which Sentinel would be liable.

According to plaintiffs, in October 1990 Hester sent them a letter in which he "demanded *** $10 million" for his property. Hester said an environmental consultant found "leaked fuel has migrated" from Sentinel's tanks to his property. The resulting contamination hindered Hester's efforts to sell his property and caused banks to refuse to refinance his mortgage.

Sentinel responded that its environmental consultant found no evidence of leakage and did not support the conclusion that Sentinel contaminated Hester's property. Sentinel concluded:

"[W]e would consider institution of a lawsuit at this time against *** Sentinel *** to be premature and without merit."

In April 1991 Hester's attorney sent plaintiffs a draft of a complaint in which Hester sought damages from both Sentinel and Exxon for the petroleum contamination. Plaintiffs provided notice to none of their insurers, continuing to rely on their environmental consultant's report. The consultants still had not determined the source of the contamination, although they believed Sentinel was not a likely source. Even when Hester filed the long-threatened suit, in July 1992, plaintiffs did not immediately notify their insurers. They did not send notice until September 23, 1992.

In August 1996 plaintiffs settled Hester's suit, obtaining dismissal of the action and a covenant not to sue for any other possible contamination of Hester's property, in exchange for payment of $320,000.

After reviewing the extensive documents and arguments, the trial court held that plaintiffs had a duty to notify all their insurers of the potential lawsuit at least by April 1991, when they received the draft complaint from Hester's attorney. They breached that duty by failing to notify the insurers until September 1992. The court granted all insurers summary judgment on all claims related to Hester's lawsuit.

The trial court also granted INA and American summary judgment on grounds that the matching deductible policies imposed no duty to defend or indemnify plaintiffs. The court found no reason to delay enforcement or appeal from the orders for summary judgment.

## I

On appeal from summary judgment for INA, plaintiffs argue that the fronting policy is ambiguous and therefore the court should construe it to require INA to pay for defense of lawsuits against plaintiffs. Plaintiffs concede that INA has no duty to indemnify them for their liability because the deductible matches the policy limits of liability.

The policy provides that INA "shall have the right and duty to defend any suit against the insured seeking damages on account of *** property damage." However, the parties appended an endorsement to the policy, and endorsements supersede conflicting policy provisions. *Central Illinois Public Service Co. v. Allianz Underwriters Insurance Co.*, 240 Ill. App. 3d 598, 604, 608 N.E.2d 155 (1992). In section 7 of the endorsement the parties agreed that INA "has no obligation to pay or contribute to any 'Loss Adjustment Expense.' Rather, the Named Insured shall pay all such expenses." Section 8 of the endorsement defines loss adjustment expense to include "[a]ttorney's fees for claims in suit [and] Court costs and other expense in connection with investigation, defense or settlement."

Plaintiffs claim that section 5 of the endorsement creates an ambiguity. That section provides:

> "Whereas the Named Insured has entered into a written agreement with a qualified claims servicing organization *** under which the *** Organization agrees to provide investigation defense and settlement services on behalf of the Insured *** it is understood and agreed that [INA] has no duty or obligation to provide investigation, defense or settlement services with respect to such claims or suits so long as such agreement with the *** Organization remains in effect."

The agreement with the claims servicing organization ended with the termination of the insurance contract in 1982, when plaintiffs obtained new matching deductible insurance from American and arranged servicing with an organization not affiliated with INA.

■ In *Allianz Underwriters*, 240 Ill. App. 3d at 602, the court held:
"The question of whether a policy is ambiguous is a matter of law, in which the court makes the determination by examining the language at issue in light of the policy as a whole. Thus, the court must construe the policy in its entirety, giving effect to all parts of the policy as is possible, including endorsements. [Citation.] Where the language of the policy is unambiguous, the policy must be understood according to its plain, ordinary and popular meaning."
Courts should not distort the language of the policy to find an ambiguity. *Dixon Distributing Co. v. Hanover Insurance Co.*, 161 Ill. 2d 433, 441, 641 N.E.2d 395 (1994).

■ Sections 7 and 8 of the endorsement unambiguously relieve INA from any obligation to pay for defense of any lawsuit brought against plaintiffs, and they unambiguously require plaintiffs to pay all such defense costs. In the context of the entire endorsement, the relationship with section 5 becomes clear. Section 1 of the endorsement establishes that INA has no duty to pay damages within the deductible, unless the claims servicing organization fails to pay the required damages. In that limited circumstance INA "shall pay such damages and the Named Insured shall reimburse [INA] promptly."

Section 5 similarly establishes that generally INA has no duty to provide defense services, but in the limited circumstance of the claims servicing organization's failure to provide the services, INA would provide them. Section 7 establishes that plaintiffs must reimburse INA for the defense services INA provides, just as plaintiffs must reimburse INA for any damages the claims servicing organization fails to pay. Section 7 includes no qualifications to its imposition of all defense costs on the plaintiffs. INA has no obligation under any circumstance to contribute to loss adjustment expenses, including attorney fees or other costs of defending lawsuits.

Plaintiffs concede that they do not seek to have INA, at plaintiffs' expense, find legal counsel for defense of the lawsuits against plaintiffs. The only relief they seek from INA is payment of costs of defending the suits. Because the policy unambiguously relieves INA from responsibility for any such costs, the trial court correctly granted it summary judgment on all counts.

## II

American Insurance sold plaintiffs matching deductible insurance covering 1983 through 1985. The policies differ from INA's policies,

and they even change somewhat from year to year. The 1984 policy includes the following endorsement:

"1. The limits of liability stated in the policy shall not be in excess of the deductible amount.

2. The deductible amount shall equal:

  a. The respective limits of liability stated in the policy for all coverages provided by the policy; and

  b. The amounts of all supplementary payments (including but not limited to allocated loss adjustment expenses) ***.

     * * *

5. The words 'allocated loss adjustment expenses' shall mean all paid expenses by [American] in connection with claim settlements."

The 1983 and 1985 policies also include supplementary payments as part of the deductible, but they include a longer parenthetical clause concerning allocated loss adjustment expenses for foreign claims. As with the 1984 policy, the parenthetical clauses in the 1983 and 1985 policies expressly do not limit the meaning of "supplementary payments." The 1985 policy alone expressly includes the supplementary payments as part of the limit of liability.

The trial court noted that no policy defines "supplementary payments," and the court found that term ambiguous. But in his deposition, plaintiffs' risk manager admitted that such payments would include

"the expenses incurred in connection with the handling of the claim, for investigation, investigative reports, legal fees, whatever sundry expenses associated with adjusting the loss, fees other than the direct fees of the claims management company."

He agreed that supplementary payments would include defense costs with regard to any claim. He also admitted that he could not think of any circumstances in which plaintiffs could tender defense of a claim to American under the policy. Plaintiffs presented no contrary affidavits or depositions. Based on the deposition, the court concluded that the parties understood the supplementary payments to include defense costs, including the costs plaintiffs sought to recover in this lawsuit.

■ We agree with the trial court's interpretation of the policy, but we do not find the policy itself ambiguous. Where an insurance contract is ambiguous, and other evidence does not resolve the ambiguity, the court must adopt any reasonable interpretation the policyholder suggests. *Allianz Underwriters*, 240 Ill. App. 3d at 602. The court need not adopt unreasonable interpretations. *Allianz Underwriters*, 240 Ill. App. 3d at 602.

■ The 1984 policy expressly includes all allocated loss adjustment

expenses as part of the policy deductible, for which plaintiffs must reimburse American. Such expenses include any amount American spends settling claims, including any cost for legal services. Therefore, if American provided legal services for settling a claim, plaintiffs would be required to reimburse it for the expense. Plaintiffs interpret the policy to require American to pay them for any amounts they spent on legal services to settle a claim. Under plaintiffs' interpretation, the parties either have endless responsibilities to keep paying each other for any such services or each party must pay the cost of whatever legal services the other obtained to defend claims against plaintiffs. American would need to pay only for services plaintiffs obtained on their own, while plaintiffs would pay only for services American obtained for them. Plaintiffs' interpretation of the contract is not reasonable. Insofar as the contract makes plaintiffs responsible for allocated loss adjustment expenses American incurs, it leaves plaintiffs also responsible for all such expenses.

The extended parenthetical clauses in the 1983 and 1985 policies are somewhat less clear, but they do not alter the meaning of the "supplementary payments" expressly included in the deductible amount. Because the policies include payment of the defense costs plaintiffs seek to recover as part of the deductible supplementary payments, the trial court correctly granted American summary judgment on all counts.

## III

The trial court granted Zurich summary judgment on claims related to the Hester suit due to late notice. Plaintiffs contend that the trial court should not have decided this contested issue of fact on summary judgment.

Zurich's policies provide:

> "If claim is made or suit is brought against the insured, the insured shall immediately forward to [Zurich] every demand, notice, summons or other process received by him or his representative." (Emphasis omitted.)

The policies separately require notice of any occurrence, which means any "event which unexpectedly causes injury during the policy period." (Emphasis omitted.)

■ In *Twin City Fire Insurance Co. v. Old World Trading Co.*, 266 Ill. App. 3d 1, 639 N.E.2d 584 (1993), the court interpreted a policy with essentially the same notice requirement. The court said:

> "The time within which notice is required is determined by a standard of reasonableness, based upon the facts and circumstances of a particular case. [Citations.] Actual prejudice to the insurer and due diligence of the insured are but factors to be considered in the

propriety of the notice and do not conclusively establish the timeliness of the notice. [Citation.] The purpose of the notice requirement is to enable the insurer to make a timely and thorough investigation of the injury claim. [Citations.] The test is whether any reasonably prudent person could foresee a lawsuit upon receipt of the first notice that would involve the insurer's policy and would either contact his attorney or his liability carrier." *Twin City*, 266 Ill. App. 3d at 7.

In *United States Fidelity & Guaranty Co. v. Maren Engineering Corp.*, 82 Ill. App. 3d 894, 403 N.E.2d 508 (1980), the insured received a phone call informing it of an accident involving equipment it produced. The insured believed it would not be liable because the equipment had been altered. When the insured received a complaint and summons about two years later, it immediately forwarded them to its insurer. The appellate court affirmed summary judgment for the insurer because the insured knew at the time of the phone call that a lawsuit might ensue, so the duty to notify the insurer arose at that time. *Maren Engineering*, 82 Ill. App. 3d at 898-99.

■ Under the facts as plaintiffs stated them to the trial court, Hester demanded $10 million from them in October 1990. Although they responded that a lawsuit seemed at the time "premature," because the environmental consultants did not agree on the probable source of the contamination, they could foresee a possible lawsuit. They showed that foresight in June 1990 by contacting their attorneys for assistance with the petroleum contamination issue. And certainly by the time they received a draft complaint from Hester's attorneys, they could foresee a lawsuit. Plaintiffs' reasons for doubting their liability cannot excuse the failure to notify Zurich here.

At oral argument plaintiffs asked this court to find Zurich estopped from raising late notice as a defense to the claim for coverage. Plaintiffs claimed that they raised the issue at trial. When we later requested specific citation to the record, plaintiffs conceded that they never raised the issue prior to oral argument on appeal. Thus, plaintiffs waived the estoppel issue by failing to raise it at trial, and they further waived it by failing to address it in their brief on appeal. See *Kubian v. Alexian Brothers Medical Center*, 272 Ill. App. 3d 246, 256, 651 N.E.2d 231 (1995). In view of the complete waiver of the issue we will not address it here. We affirm summary judgment for Zurich on the claim Hester brought against plaintiffs.

## IV

The trial court also found plaintiffs breached the notice requirements of the excess insurance policies. The excess policies vary significantly from each other, as each insurer used the language it

preferred in its policies. Several insurers promised to pay damages in excess of $250,000; one promised to pay up to $100,000 if damages exceed a mere $150,000 for a single occurrence. Other insurers had no liability unless damages exceeded $1 million, and some had no liability for amounts less than $5 million.

The phrasing of the notice requirements also varies from policy to policy. However, most require notice when a claim or occurrence "appears likely to result in liability" in excess of the policy's minimum, or when a claim or occurrence is "reasonably likely to involve" the insurer. Other policies require notice of any occurrence or claim that is likely to involve the policy, if the insured is found liable. Several policies explicitly provide that the insured meets the notice requirement by giving notice once the insured has information showing that the policy is likely to be involved, even if the insured gathers such information long after knowledge of the occurrence.

One policy had a markedly different notice requirement. Executive Re Indemnity provided coverage for losses in excess of $250,000, up to a limit of $1 million, for 1979 through 1981. Its policy requires immediate notice of any

> "occurrence which, in the Insured's or underlying insurer's estimate of the value of injuries or damages sought, WITHOUT REGARD TO LIABILITY, might result in a judgement in an amount sufficient to involve [the insurance]." (Emphasis in original.)

Under this policy, plaintiffs needed to notify the insurer of any occurrence in which the injured party's total damages appeared likely to exceed $250,000, even if the insured believed it could not be held liable for those damages.

The trial court held that all of the policies required plaintiffs to notify the insurers at the latest by the time plaintiffs received the draft complaint from Hester's attorney, especially because Hester had previously demanded $10 million from plaintiffs in exchange for his property. Plaintiffs point out that from the time they learned of the petroleum contamination they investigated the claim, hiring an environmental consultant, and they concluded they were not likely to be found liable.

■ The fundamental principles governing notice to primary insurers also apply to notice to excess insurers. *Twin City*, 266 Ill. App. 3d at 9.

> "[T]he insured *** is required to act as a reasonably prudent person. [Citation.] Among the facts and circumstances to be considered in ascertaining whether the insured has met such standard are (1) the language chosen by the insurer to define the

policy's notice requirement [citation]; (2) the presence or absence of the insured's sophistication in the world of commerce and insurance [citation]; (3) awareness on the part of the insured that an occurrence as defined by the policy has taken place [citation]; and (4) once aware of an occurrence, the diligence with which the insured ascertains whether policy coverage is available." *Brownlee v. Western Chain Co.*, 74 Ill. App. 3d 804, 808-09, 393 N.E.2d 515 (1979).

Although these principles apply to both primary and excess insurance, some systematic differences between primary and excess insurance lead to differences in the application of the principles. Most significantly, excess policies

"generally do not require immediate notice of an occurrence as do provisions in primary policies. [Citation.] Excess insurers are not interested in every accident, ' "but only in those that may be serious enough to involve [them.]" ' [Citation.] Since excess coverage is contingent on exhaustion of primary or underlying policies, excess insurers generally do not require notification of occurrences until the excess policy is reasonably likely to be implicated. [Citation.] Consequently, insurance policies for excess coverage generally grant the insured some discretion in evaluating the case." *American States Insurance Co. v. National Cycle, Inc.*, 260 Ill. App. 3d 299, 311, 631 N.E.2d 1292 (1994).

All of the excess policies here grant the insured such discretion.

■ This court reviews summary judgments *de novo* to determine whether the record presents a genuine issue of fact. *Kerr v. Illinois Central R.R. Co.*, 283 Ill. App. 3d 574, 583, 670 N.E.2d 759 (1996). "[W]here reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact." *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114, 649 N.E.2d 1323 (1995). On appeal, then, we must determine whether all reasonable persons would agree that plaintiffs acted unreasonably by waiting until September 1992 to notify their excess insurers of Hester's claim. To answer this question we must determine when a reasonable person would have believed it reasonably likely that the claim would implicate the excess insurance. See *Hartford Accident & Indemnity Co. v. Rush-Presbyterian-St. Luke's Medical Center*, 231 Ill. App. 3d 143, 150, 595 N.E.2d 1311 (1992); *Atlanta International Insurance Co. v. Checker Taxi Co.*, 214 Ill. App. 3d 440, 444, 574 N.E.2d 22 (1991).

According to plaintiffs' own statement of facts, Hester demanded $10 million from them in October 1990, in exchange for Hester's property. Plaintiffs responded that a lawsuit over the pollution appeared

"premature." Six months later Hester's attorney sent plaintiffs a draft complaint which he threatened to file if plaintiffs refused to purchase the property. The *ad damnum* of the complaint specified no amount of claimed damages. Instead, it stated only that Hester had suffered damages in excess of the jurisdictional amount.

Plaintiffs also admit that even before Hester's demand, they had begun investigation of the petroleum contamination of their property and the surrounding properties. Their environmental consultant reported that Exxon probably caused the contamination. Based largely on this report, plaintiffs apparently concluded that the claim was not likely to involve excess coverage. No internal memorandum or report shows that plaintiffs or their officers at any time prior to notifying insurers believed they faced a likelihood of substantial liability for the petroleum contamination. Plaintiffs eventually settled the lawsuit for $320,000, an amount insufficient to implicate coverage for many of the excess policies.

■ We find that under the facts of this case, reasonable persons could have believed that Hester's claim was not likely to rise to the level of involving at least some of the excess policies. For the policies that provide no coverage unless plaintiffs' liability exceeds $1 million, the eventual settlement apparently vindicates plaintiffs' belief that the claim would not implicate the policies. As the time for notice under those policies may never have arisen, we cannot affirm summary judgment for all of the excess insurers on grounds of late notice.

Some of the excess insurers, including Columbia Casualty, require notice only when a claim or occurrence "appears likely to involve" the excess policy, or the occurrence is "likely to give rise to a claim" within the excess coverage. The excess insurance will not be involved, and the claim will not fall within excess coverage, unless the claim results in liability exceeding the underlying coverage. The policies give the insured considerable discretion for deciding whether a claim appears reasonably likely to result in liability within the coverage. For all such insurers, disputed factual issues concerning the likelihood that their excess insurance would be involved require us to reverse the decision granting them summary judgment.

Other insurers, including the underwriters at Lloyd's, London, require notice of an occurrence which "involves injuries or damages which, in the event that the Assured should be held liable, is likely to involve this policy." When "words in the policy are susceptible to more than one reasonable interpretation, they are ambiguous [citation] and will be construed in favor of the insured and against the insurer who drafted the policy." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108-09, 607 N.E.2d 1204 (1992). Construing

the policy language narrowly in favor of the insured, the policies require notice only when plaintiffs reasonably believe that their probable share of the total liability will exceed the underlying insurance.

Here, Hester accused both Exxon and plaintiffs of damaging his property. The plaintiffs presented evidence that they reasonably believed that even if they were held liable, they would be liable for only a small part of Hester's loss, because their consultant believed Exxon was primarily responsible for the contamination. We cannot conclude as a matter of law that plaintiffs violated the policy by failing to notify Lloyd's until September 1992.

Executive Re Indemnity's policy required notice whenever a claimant's total damages, without regard to liability, appeared likely to exceed $250,000. At least by April 1991 plaintiffs knew Hester claimed substantial damage to his property from petroleum contamination. Plaintiffs' own costs for cleaning up the petroleum on their property, and the report of Exxon's environmental consultant, provided ample indication that Hester's costs would likely exceed $250,000. Plaintiffs presented no contrary indication that they ever found any evidence that Hester had not suffered substantial petroleum contamination. Plaintiffs focused their investigation on whether Exxon or plaintiffs had greater fault for the damages. Under the circumstances of this case, we find that plaintiffs have not presented an adequate excuse for their failure to notify Executive Re Indemnity of the occurrence until September 1992, 17 months after they received the draft complaint and 27 months after they began concerted investigation to determine possible liability for the uncontested, substantial petroleum contamination of Hester's property. We affirm summary judgment for Executive Re Indemnity on claims based on Hester's claim against plaintiffs.

## V

The facts of this case suggest many possible alternate grounds for summary judgment. The insurers have filed several motions for summary judgment on several different bases, including pollution exclusions and other pertinent policy defenses. The parties have not yet argued those motions in the trial court. Although we have the power to affirm summary judgment on any basis supported by the record, we believe that in this complex litigation we should allow the parties a full opportunity to argue before the trial court any possible alternate grounds for summary judgment.

We affirm summary judgment in favor of the insurers that issued matching deductible policies, because the policies included all amounts paid for defense of claims as part of the deductible, for which plaintiffs retained sole responsibility. We affirm summary judgment for Zurich

on the Hester claim because plaintiffs failed to notify their primary insurer of the claim for many months after they could foresee a possible lawsuit from Hester. And we affirm summary judgment for Executive Re Indemnity because plaintiffs failed to inform Executive of Hester's claims until long after they reasonably should have known that Hester's total damages from petroleum contamination would likely exceed the $250,000 minimum needed to involve Executive's excess coverage. We reverse summary judgment for all other excess insurers and remand for further proceedings on their various motions for summary judgment and for other proceedings in accord with this opinion.

Affirmed in part, reversed in part, and remanded.

GORDON, P.J., and RAKOWSKI, J., concur.