FIFTH DIVISION

May 18, 2001

Nos. 1-99-2094 and 1-99-3044 cons. 

HOUSEHOLD INTERNATIONAL, INC. )         Appeal from

)         the Circuit Court

Plaintiff-Appellant, )         of Cook County.

)

v. )       No. 96-CH-1521

)

LIBERTY MUTUAL INSURANCE COMPANY; )          Honorable

HIGHLANDS INSURANCE COMPANY; )          Lester D. Foreman,

THE HOME INSURANCE COMPANY; )          Judge Presiding.

ALLSTATE INSURANCE COMPANY, as )

Successor in Interest to Northbrook Excess    )

and Surplus Insurance Company, )

formerly known as Northbrook Insurance )

Company, CENTURY INDEMNITY )

COMPANY, as Successor in Interest to )

Insurance Company of North )

America, CENTURY INDEMNITY )

COMPANY, as Successor in Interest to Cigna )

Specialty Insurance Company, formerly )

known as California Union Insurance )

Company; and CONTINENTAL INSURANCE )

COMPANY, as Successor to Certain Policies of )

Insurance Issued by Harbor Insurance )

Company, now known as Greenwich )

Insurance Company, )

)

Defendants-Appellees. )      

MODIFIED OPINION UPON DENIAL OF REHEARING

JUSTICE THEIS delivered the opinion of the court:

Plaintiff, Household International, Inc. (Household), appeals from the orders of the circuit court
 granting summary judgment to certain defendant insurance companies and awarding them costs.  Household sought declaratory relief and damages for the insurers' refusal to defend and indemnify it in connection with liabilities arising out of third-party environmental claims at several of its industrial sites.  The circuit court held that certain defendants had no duty to defend and indemnify Household on the ground that it failed to provide timely notice of the claims as required by the policies.  This court acquired jurisdiction to hear the matter pursuant to Supreme Court Rule 304(a).  155 Ill. 2d R. 304(a).

While the matter was pending on appeal, Household settled with defendant Liberty Mutual Insurance Company (Liberty), the primary insurer.  Accordingly, the remaining issues involve only those relating to the excess and umbrella liability insurers.   Household contends that the court erred in applying New York law to some of these policies, that a genuine issue of material fact remains regarding the reasonableness of its notice, that defendants' late notice defense is defeated by principles of estoppel and waiver,  and that defendants failed to establish that they were prejudiced by any alleged late notice.  Additionally, Household asserts that the court abused its discretion in awarding costs to the prevailing defendants pursuant to section 5-109 of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/5-109 (West 1998)).  For the following reasons,  we affirm.

BACKGROUND

The underlying environmental claims at issue involve industrial sites in Newcomerstown, Ohio, and Fitchburg, Massachusetts, from 1965 to 1988.  From 1965 to 1981, both facilities were owned and operated by the Simonds Cutting Tools Division of the Wallace-Murray Corporation (Wallace-Murray).  Wallace-Murray was a subsidiary of the Dyson-Kissner-Moran Corporation (DKM).  In 1981, Wallace-Murray, including the Simonds Cutting Tools Division, was acquired by Household.  Household's ownership ended in 1988, when another entity, Simonds Industries, Inc., purchased both the Newcomerstown and Fitchburg facilities.  However, Household retained responsibility for the environmental claims at both sites.

Between 1965 and 1988, Household and its predecessors purchased comprehensive general liability insurance policies from a variety of insurers for liabilities related to both the Newcomerstown and Fitchburg sites.  The Home Insurance Company (Home) issued first-level excess coverage for the period 1967 to 1976  for liabilities in excess of $500,000 (policy Nos. HEC9556452, HEC9792118, and HEC4429253).  
The Highlands Insurance Company (Highlands) issued first-level excess coverage for the period 1976 to 1981 for liabilities in excess of $1 million (policy Nos. XS719899, XS205151, XS205929, XS206301, and XS206366), and issued high-level excess coverage for the period 1979 to 1981 for liabilities in excess of $16 million (policy Nos. SR20721 and SR21016).  Allstate Insurance Company, as successor in interest to Northbrook Excess and Surplus Insurance Company, formerly known as Northbrook Insurance Company  (Northbrook), issued high-level excess coverage for the period 1977 to 1981.  These policies attached at various amounts including $5.5 million (policy No. 63002719), $16 million (policy No. 63007530), and $51 million (policy Nos. 63005718 and 63006289).
  Century Indemnity Company (Century), as successor in interest to Insurance Company of North America (INA), issued high-level excess coverage for the period 1969 to 1975, for liabilities in excess of $5.5 million (policy No. XCP-3827) and $15.5 million (policy No. XCP-3822).   All of these policies were issued to Wallace-Murray as the named insured or to DKM, its parent corporation.  Additionally, Century, as successor in interest to Cigna Specialty Insurance Company, formerly known as California Union Insurance Company (California Union), issued high-level excess coverage for the period 1980 to 1983 for liabilities in excess of $6 million (policy No. ZCX 00 4185) and $11 million (policy Nos. ZCX 00 6097 and ZCX 00 6414).  Those policies were issued to Household as the named insured.

Although the notice provisions in the policies vary somewhat, they are essentially consistent for purposes of our review.  The policies require the insured to give notice "as soon as practicable" in the event of an "occurrence" for which the insured may be held liable and which is " likely to involve" the policy.  The Home, Northbrook and INA policies also contain a "savings clause" which provides:

" '[F]ailure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claim.' " 

 In addition to notice of an occurrence, the Highlands policies also require  "immediate" notice of "claims" and "suits."  

Newcomerstown site

Household and its predecessors manufactured steel files and other industrial tools at the Newcomerstown site.  Historically, liquid effluents generated in connection with the manufacturing process were dumped into a ditch running from the plant directly into the nearby Tuscarawas River.  In 1964 and 1967 two lagoons were constructed at the site to receive the effluent stream to prevent discharge directly into the adjoining river, and they were used as settling ponds to remove solid wastes.  A series of ditches carried the wastewater from the plant into the lagoons. 

The record establishes that in June 1982, the Ohio Environmental Protection Agency (OEPA) advised Household that its waste treatment and disposal practices in connection with the two on-site lagoons were in violation of federal and state hazardous waste regulations and required Household to inspect the lagoons for the presence of contaminants.  The matter was referred to in-house counsel, who recognized that if the water or sediment or surrounding soil contained high levels of lead and/or trichloroethylene (TCE), the cost to remediate could be several hundred thousand dollars.  As a result, outside counsel was retained to represent Household, and an environmental consulting firm was hired to test the lagoons for lead.  While additionally aware of the possibility of cyanide, it did not mention this fact to OEPA "for fear [OEPA] would require [Household] to test for the possible presence of many, many compounds."

By November 1983, OEPA evaluated the testing and agreed that Household was in "apparent compliance" with Ohio hazardous waste regulations, "[a]ssuming that no hazardous waste enters the impoundments in the future."  However, in 1986, OEPA required more comprehensive testing of the lagoons and other related areas of the site for compliance with the Clean Water Act (33 U.S.C. § 1251 
et
 
seq.
 (1986)).  Household retained another environmental consulting firm to perform a wastewater characterization study.  OEPA concluded, based on its review of the study, that the wastewater discharges from the manufacturing operations contained hazardous levels of lead and selenium and continued to be discharged into the lagoons.  This testing contradicted the earlier information provided by Household in 1983 indicating that hazardous wastes were no longer being discharged.  

In April 1987, Household received notification from the United States Environmental Protection Agency (USEPA) that it would be required to submit a closure plan to address the remediation of the lagoons.  Household agreed to submit a closure plan and groundwater monitoring plan to assess whether there had been any release of contaminants to the groundwater and to what extent any migration had occurred.   In July 1987, OEPA also required a written closure plan for the lagoons and advised Household that its facility was being classified as a "high priority violator" and that the case would be referred to OEPA's central office for "enforcement action."   By July 1987,  both federal and state environmental agencies were requiring Household to remediate the lagoons.  Test results confirmed lead, cyanide, TCE, and trichloroethane (TCA) were present in the sediment and water in the lagoons.  Household's consultants estimated the cost to close the lagoons at $1.6 million.  In December 1987, OEPA sent Household an administrative consent decree addressing violations at the site, including failure to adequately evaluate wastes produced by the facility.  No agreement was entered into at that time.  

In 1988, Household entered into negotiations with a third party to sell the Newcomerstown facility.  An environmental consulting firm was hired to evaluate potential environmental liabilities at the site.  The report confirmed that the groundwater was contaminated with TCA ,TCE and cyanide and identified other problems including an abandoned landfill that would also have to be remediated.  The remediation cost for these problems was estimated to be between $4.4 million and $14.6 million.  Household sold the property, agreeing to remediate the site and to retain all "active and ongoing" environmental liabilities.    

On April 7, 1989, OEPA sued Household to enforce compliance with environmental regulations.  The suit alleged,
 inter
 
alia
, that, since "at least" as early as 1979 and continuing to the present, Household and its predecessors discharged hazardous waste from the lagoons  into the nearby Tuscarawas River without a permit and caused groundwater contamination at the site.  OEPA sought payment of a penalty  and remediation of the lagoons, ditches, and on-site landfill pursuant to a closure plan.   At Household's request, its consultants estimated the costs of potential alternatives for the closure of the lagoons.  The estimated costs for OEPA's clean closure demands were as high as $44 million.  Household was further informed by counsel that it could not "realistically expect to avoid" these costs.  Two years later, in March 1991, Household notified its excess/umbrella insurers Home, Highlands, INA, and Northbrook of a claim.  Subsequently, in 1992, Household entered into a consent decree with OEPA and resolved the underlying lawsuit.  Three years later, in July 1995, Household notified California Union of its claim.       

Fitchburg site

Household and its predecessors manufactured band saw blades and industrial cutting tools at the Fitchburg facility beginning in 1939.  Byproducts generated by the manufacturing process were placed in an on-site landfill until 1985.  In 1982, USEPA concluded that volatile organic compounds (VOCs) had leached into the groundwater from the on-site landfill.  The Massachusetts environmental authorities (DEQE) advised Household in 1983 that these contaminants were disposed of on its site from 1931 to 1980, and required Household to initiate a program to investigate the soils in and around the landfill for presentation to the DEQE and for subsequent evaluation.  Household hired environmental consultants and assigned in-house counsel to be responsible for the environmental claim.  A 1987 report revealed that groundwater contamination existed down gradient, but not up gradient from the landfill, suggesting that the landfill was the most likely source of the contamination.  In 1988, possible contamination was discovered from underground storage tanks.  Household was aware that contamination around certain tanks occurred sometime between 1946 and 1989 and around others between 1951 and 1989.   

In 1988, the purchasers of the facility performed an on-site investigation of the facility and estimated the potential range of remediation costs to be between $400,000 and $3.3 million.  Household agreed to perform remediation at the site.  Its in-house environmental consultant advised the company that it would cost $1.34 million to complete the remediation.  By December 1989, Household's counsel reported that "potential claimants" have communicated "an intention to commence litigation or to assert or enforce possible claims against the company" for the Fitchburg cleanup.  Household informed the buyer in 1991 that the estimated cost to investigate and remediate the site was about $3 million.  In November 1991, Household provided notice of likely governmental enforcement action  to excess carriers, Home and Highlands.  On December 2, 1991, it provided notice to INA, and on July 31, 1995, it provided notice to Northbrook.   The insurers all denied coverage.

As a result of the insurers' coverage denials, Household brought an action against defendants seeking declaratory relief and damages for the insurers' alleged breach of their duties to defend and indemnify for the environmental claims asserted against it in connection with the contaminated sites.  Subsequently, all defendants moved for summary judgment based upon the notice conditions in the policies.  Household then filed a cross-motion for partial summary judgment as to certain insurers' duty to defend Household in connection with the OEPA lawsuit.  The circuit court, proceeding on defendants' motion first, found that New York law applied to policies issued by Home, Highlands, Northbrook and INA.  The court held that Household's notice to its insurers under those policies was untimely as a matter of law, awarded costs with respect to those claims, and denied summary judgment to the remaining policies, to which it applied Illinois law.  Those rulings are the subject of appeal No. 1-99-2094.  Subsequently, defendant California Union filed a motion for reconsideration of the court's denial of summary judgment as to its policies.  The court, applying Illinois law, granted the motion for reconsideration, and also awarded costs.  That ruling is the subject of appeal No. 1-99-3044.

ANALYSIS

Conflicts of Law

As a threshold matter, we consider Household's contention that the circuit court erred in applying New York law to the excess/umbrella policies issued to Wallace-Murray or DKM.  Since it is undisputed that Illinois law applies to the California Union policies issued to Household, those policies will be considered separately.  Before undertaking a choice-of-law analysis, we must determine whether there is a conflict between New York law and Illinois law on the issue of notice that would make a difference in the outcome of the case.  
Morris B. Chapman & Associates, Ltd. v. Kitzman
, 307 Ill. App. 3d 92, 101, 716 N.E.2d 829, 838 (1999).   

Upon review of the relevant law, we find that conflict indeed exists between Illinois and New York law with respect to the late notice defense.  Under Illinois law, for an insurer to be relieved of its duty to indemnify an insured who fails to notify it of a suit, the insurer must prove that it was prejudiced by the insured's omission or delay.  
Illinois Founders Insurance Co. v. Barnett
, 304 Ill. App. 3d 602, 611-12, 710 N.E.2d 28, 35 (1999).   Additionally, in determining whether an insured has failed to provide timely notice of an occurrence, the absence of prejudice to the insurer is a factor that may be considered.  
Millers Mutual Insurance Ass'n. v. Graham Oil Co.
, 282 Ill. App. 3d 129, 141, 668 N.E.2d 223, 232 (1996).  In contrast, under New York law, excess insurers may assert late notice as a complete defense without demonstrating that the delay in notice caused prejudice to their position.  
American Home Assurance Co. v. International Insurance Co.
, 90 N.Y.2d 433, 440, 684 N.E.2d 14, 16, 661 N.Y.S.2d 584, 586 (1997).   

A further conflict exists on the issue of whether an insurer may be estopped from asserting  defenses to coverage.  Under Illinois law, the supreme court has recently held that an insurer may be estopped from asserting the late notice of occurrence or suit provision as a policy defense to coverage when it has breached its duty to defend by failing to either defend its insured under a reservation of rights or promptly litigate the matter in a declaratory judgment action.   
Employers Insurance v. Ehlco Liquidating Trust
, 186 Ill. 2d 127, 152-53, 708 N.E.2d 1122, 1135-36 (1999).   No such rule has been espoused under New York law.  Rather, the courts have held that the insurer does not forfeit policy defenses to coverage for improperly failing to defend its insured.  
Servidone Construction Corp. v. Security Insurance Co. of Hartford
, 64 N.Y.2d 419, 423-24,  477 N.E.2d 441, 444,  488 N.Y.S.2d 139, 142 (1995).  Accordingly, because a conflict exists, and none of the policies contain an express choice-of-law provision, we must examine Illinois general choice-of-law rules to determine which state's law should apply to the policies at issue.  
Emerson Electric Co. v. Aetna Casualty & Surety Co.
, 319 Ill. App. 3d 218, 231-32, 743 N.E.2d 629, 639 (2001).
  Our review is 
de
 
novo
.  
Malatesta v. Mitsubishi Aircraft International, Inc.
, 275 Ill. App. 3d 370, 384, 655 N.E.2d 1093, 1102 (1995).

Where the insurance policy does not contain an express choice of law, as in the present case, the policy provisions are  "'governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract.'"  
Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.
, 166 Ill. 2d 520, 526-27,  655 N.E.2d 842, 845 (1995), quoting 
Hofeld v. Nationwide Life Insurance Co.
, 59 Ill. 2d  522, 528, 322 N.E.2d 454, 457-58 (1975).  

In applying the "significant contacts" test to the present case, we conclude that the law of New York applies to the Wallace-Murray/DKM policies.   It is undisputed that the contracts were negotiated, issued, and delivered to Wallace-Murray/DKM at its corporate headquarters in New York and that the last act giving rise to the contract, whether it be signing the policy, paying the premium or receiving the contract, occurred in New York.
  At the time the contracts were negotiated, the insured's risk management department was located in New York, and all of the insurers were doing business in New York.  Since the risk is located in more than one state, Ohio and Massachusetts, the location of the subject matter
 is entitled to little weight in our analysis.  
Lapham-Hickey
, 166 Ill. 2d
 at 527, 655 N.E.2d at 845;
 
Emerson
, 319 Ill. App. 3d at 233, 743 N.E.2d at 640. 

Notwithstanding these  facts, Household argues that Illinois law should govern the obligations under the insurance contract because Wallace-Murray was subsequently acquired by Household, an Illinois corporation, after the policy periods at issue had expired.  As a result,  its place of domicile is now Illinois, and the place of performance, where the claims would be paid, would be Illinois.   Defendants urge that the place of domicile must be considered as of the time the insurance policies were issued, rather than years or decades later when a claim on the policy arises.  

Defendants' argument is consistent with the principle espoused by the Restatement (Second) of Conflicts of Laws, that the justified expectations of the parties are to be protected, and the Restatement's emphasis on the predictability and uniformity of result, and ease in determination and application of the law to be applied.   Restatement (Second) of Conflict of Laws §6(2)(d), Explanatory Notes, Comment 
c
, at 12, Comment 
g,
 at 15 (1971); Restatement (Second) of Conflict of Laws §6(2)(f), (2)(g) (1971).   These policies were 
occurrence-based policies in which the insurer agreed to cover the insured for liabilities arising at the time of an occurrence.   At the time the insurer issued the policy and agreed to be on the risk, the insured was domiciled in New York, and the underlying claims arose out of actions of the insured during the period when it was domiciled in New York.  Thus, in the context of an occurrence-based policy, the place of domicile must be considered as of the time the insurer agreed to be on the risk.   A contrary result would open these policies to different views of the law, depending upon where the insured is located at any given time when a claim is made on the policy, a result that would be unpredictable and not in keeping with the justified expectations of the parties.  Accordingly, we conclude that the law of New York is most readily applicable to the excess/umbrella policies issued to Wallace-Murray/DKM.

Late Notice to Excess Insurers

Under New York law, compliance with a notice of occurrence provision in an insurance policy is a condition precedent to recovery and failure by the insured to comply with such requirement relieves the insurer of liability.   
Commercial Union Insurance Co. v. International Flavors & Fragrances, Inc.
, 822 F.2d 267, 271 (2d Cir. 1987).  The duty to notify an excess insurer, under notice provisions similar to those found in the policies at issue, accrues when the circumstances known to the insured would have suggested a reasonable possibility of a claim that would trigger the excess insurer's coverage.  
Olin Corp. v. Insurance Co. of North America
, 743 F. Supp. 1044, 1054 (S.D.N.Y. 1990), 
aff'd
, 929 F.2d 62, 64 (2d Cir. 1991).  Thus, the two important considerations for review include (1) the reasonable possibility of a claim; and (2) the reasonable likelihood that the claim would implicate the excess policy layers. 

However, a delay in notifying an insurer of a potential claim or occurrence may be excused where an insured can prove that it had a reasonable good-faith belief in nonliability or noncoverage.  
Reynolds Metal Co. v. Aetna Casualty & Surety Co.
, 259 A.D.2d 195, 199-200, 696 N.Y.S.2d 563, 567 (1999).  The question of whether the delay is excusable is generally a question of fact for the jury, but may be determined as a matter of law when either no excuse is advanced or a proffered excuse has no merit.  
Olin Corp. v. Insurance Co. of North America
, 966 F.2d 718, 724 (2d Cir. 1992).  Where no valid excuse has been offered, even a short delay will be held unreasonable.  
American Home Assurance Co. v. Republic Insurance Co.
, 984 F.2d 76, 78 (2d Cir. 1993).  

Household contends that there are disputed questions of material fact regarding the reasonableness of its notice.  It argues that prior to 1991, when it first notified the excess insurers of a claim, it did not have a reasonable basis to conclude that its excess policies would be implicated because it was not evident that there had been an occurrence of third-party property damage during each of the policy periods spanning from 1965 to 1981.  Furthermore, given the widely disparate cost estimates to remediate the contamination, it believed its liability was unlikely to implicate its excess layers of coverage.   Initially, we note that while Household submitted affidavits and deposition testimony regarding its subjective beliefs, the test for whether the insured's belief was reasonable under the circumstances is an objective one.  
Olin
, 743 F. Supp. at 1053.   

 In this context, we conclude that Household was sufficiently aware of the possibility of an occurrence threatening third-party property damage at Newcomerstown prior to March 1991
.  As of 1986, Household knew that the wastewater discharges from its manufacturing operations contained hazardous waste.  By 1987, it was aware that it faced environmental liability in connection with the lagoons from OEPA and USEPA as a result of test results confirming lead, cyanide, TCE and TCA in the sediment.   It was also evident by 1988, when it entered into negotiations to sell the facility to a third party, that the groundwater was contaminated with TCA, TCE and cyanide, and that it agreed to remediate and retain liability for these environmental problems.   Certainly, by 1989,  when OEPA filed a suit against Household alleging damage to the groundwater and the nearby river as a result of its operations at the site, Household was eminently aware of the possibility of contamination at Newcomerstown causing third-party property damage.

At Fitchburg, Household was aware of groundwater contamination as far back as 1982.  Its own consultants reported that its landfill was the likely source of the contamination in 1987.   By December 1989, Household's counsel was fully aware that third parties or "potential claimants" intended to commence litigation to enforce possible claims against the company for the cleanup.  Accordingly, Household's belief that there was no third-party property damage until it provided notice in November and December 1991 was unreasonable as a matter of law.    

With respect to Household's argument that it was uncertain whether the damage occurred during the relevant policy years,  the insured need not unequivocally know that third-party property damage took place during each policy period for the notice requirement to be triggered.  All that is required is the possibility or potential for a claim.  
Olin
, 743 F. Supp. at 1054.
   At Newcomerstown, the 1989 lawsuit specifically alleged that since "at least" as early as 1979 and continuing to the present, Household and its predecessors discharged hazardous waste from the lagoons into the nearby river without a permit and caused groundwater contamination.   

While Household argues that its 1983 clean bill of health provided it with a reasonable belief that its pre-1983 policies would not be implicated, the record indicates otherwise.  Household knew that the discharges from its manufacturing operations began in the early 1960s, and that at least cyanide, one of the hazardous contaminants found to be present in the groundwater, was used in the manufacturing process until 1983.  The record also reveals that the presence of this contaminant was not reported to OEPA in 1983.  Accordingly, based on the insured's knowledge of events and the reasonable inferences that could be inferred therefrom, we find
 objectively, by at least 1989, a reasonable policyholder would have been aware of the possibility that the presence of contamination in the late 1980s resulted from its operations at the site since its inception in the early 1960s.  See 
Martinson v. Massachusetts Bay Insurance Co.
, 947 F. Supp. 124, 130 (S.D.N.Y. 1996) (even though lawsuit did not mention years for which damages were sought, insured's knowledge of its dumping practices made it unreasonable for insured to conclude that only current carrier needed notification).  Furthermore, that Household was later found to be ultimately not liable for the contamination at Newcomerstown is irrelevant to a determination of  its potential liability in 1989.  

The evidence with respect to Fitchburg is even more compelling where the DEQE advised Household in 1983 that VOCs were disposed of on its site from 1931 to 1980, and where the byproducts generated from the manufacturing process were placed at the on-site contaminated landfill from its inception until 1985.  Accordingly, it was unreasonable, as a matter of law, for Household to have concluded that its insurance policies since 1965 would not be implicated.         

We next address Household's argument that it had insufficient knowledge prior to 1991 that its excess layers of coverage would be implicated.
  Because the excess policies require notice of an occurrence only when the insured reasonably believes that its liability is likely to reach its excess layers of coverage (
Olin
, 743 F. Supp. at 1054), we must determine whether defendants presented sufficient evidentiary facts to demonstrate, as a matter of law, that Household knew, prior to March 1991, that its potential liability would "likely" reach its higher layers of coverage.  See 
Reynolds Metal
, 259 A.D.2d at 203, 696 N.Y.S.2d at 569 (denial of summary judgment where no evidence presented regarding actual estimates for clean-up costs).

Initially, we note that none of the parties nor the trial court specifically addressed this issue below as it relates to the exhaustion of the underlying limits of coverage for each individual excess/umbrella policy.  
 As stated earlier, the language of the notice condition in the policies requires notice when there is an occurrence "likely to involve 
this
 policy."  (Emphasis added.)  Household's excess policies attached at amounts as low as $500,000 and as high as $51 million.  Consequently, an excess policy with an "attachment point" of $51 million in excess of underlying coverage will not be implicated until the insured has exhausted $51 million in lower-level coverage.  

In this context, with regard to the Newcomerstown claim, the record establishes that, by 1989, the actual estimated costs to comply with OEPA's clean closure demands were as high as $44 million.   Household was also informed by counsel that it could not "realistically expect to avoid" these costs.  Accordingly, by 1989, Household had a duty to notify those excess insurers whose policies would be triggered at amounts up to $44 million.  Those insurers include Home, Highlands, INA, and Northbrook (policy Nos. 63002719 and 63007530), whose policies all attached at levels far below $44 million.   The so called "savings clause," while providing some discretion to the insured as to when to notify its excess carriers, does not toll the time for notice indefinitely.  Here, it is clear that these policies would likely be implicated.   
While we find a question of fact remains as to whether, prior to March 1991, it was reasonable for Household to believe that the Newcomerstown claim would not "likely"  involve Northbrook's  higher excess policies (policy Nos. 63005718 and 63006289) which attached at $51 million,  Household's third amended complaint limits the controversy with respect to Newcomerstown to those insurers with excess levels of approximately $18.5 million.  Therefore, the higher level Northbrook policies are not implicated.  Accordingly, summary judgment was appropriate as to all relevant policies at the Newcomerstown site.

With regard to the Fitchburg claim, the evidence presented reveals that the actual cost estimates to investigate and remediate the site did not involve amounts beyond $3 million.  While we find a question of fact remains as to whether, prior to March 1991, it was reasonable for Household to believe that the Fitchburg claim would not "likely" involve its policies whose excess coverage was implicated at amounts greater than $3 million,  Household limits the actual controversy in its third amended complaint to those insurers that provided coverage up to levels of approximately $4.8 million.  Accordingly, since the insurers whose policies incept at amounts greater than $3 million are not implicated by the complaint, summary judgment was appropriate as to all relevant defendants at the Fitchburg site. 

We reject Household's argument that it provided reasonable notice to the remaining excess insurers where the insurers denied the existence of the very same occurrence for which they simultaneously argue Household had an obligation to notify them.  We agree with the insurers that such a position confuses the various burdens between the insured and insurer.  Notice is a condition precedent to coverage, and the insured bears the burden of proving its entitlement to coverage.  
Munzer v. St. Paul Fire & Marine Insurance Co.
, 145 A.D.2d 193, 199, 538 N.Y.2d 633, 636  (1989).  As stated previously, once the insured knows of the 
potential
 for a claim and that it is reasonably 
likely
 to impact its excess policies, it has a duty to provide notice.  The insurers have a subsequent right to contest whether a covered claim exists irrespective of and independent from the insured's obligation to provide notice.  The insurer cannot know whether there is a covered occurrence until it receives the notice from its insured and investigates the claim.

We further reject Household's contention that its notice was reasonable because insurers were routinely disclaiming coverage for this type of environmental claim, and therefore it would have been futile to provide earlier notice to its excess insurers until the law was more favorable.  This futility argument has been rejected under New York law.  
Ogden Corp. v. Travelers Indemnity Co.
, 739 F.  Supp. 796, 803 (S.D.N.Y. 1989) ("[T]here is a lack of any reported authority for the proposition that 'futility' constitutes a valid excuse for timely notice of occurrence.  Consequently, the Court does not accept the *** futility argument as a legal excuse *** for untimely notice of occurrence.").  Were we to adopt Household's approach, notice would be reasonable whenever the insured decided the law was sufficiently settled and coverage was available.  This approach would defeat the purpose of the notice condition.  See 
Aetna Casualty & Surety Co. v. Dow Chemical Co.
, 10 F. Supp. 2d 800, 810 (E.D. Mich. 1998).  

Additionally, we find no merit to Household's argument that the excess insurers waived the late notice defense when they responded to Household's notice, a condition precedent to coverage, and demanded that it fully perform under the so-called "cooperation clause."   This clause generally imposes upon an insured the duty to "give all such information and assistance as the insurers may reasonably require."  Household's argument is unsupported by New York case law and is otherwise unavailing.   Waiver is the relinquishment of a known right.  
Gilbert Frank Corp. v. Federal Insurance Co.
, 70 N.Y.2d 966, 968, 520 N.E.2d 512, 514, 525 N.Y.S.2d 793, 795 (1988).  Nothing in the insurers' conduct, in requesting information to make their initial coverage determination, suggests that they ever intended to relinquish their right to contest the notice condition.   Under Household's reasoning, an insurer would waive its right to contest the notice provision without having had an opportunity to investigate whether notice was indeed late. 

Lastly, we need not consider Household's prejudice argument because as previously stated, under New York law, an insurer need not prove prejudice before it can assert the defense of noncompliance with the notice provisions.  
International
, 90 N.Y.2d at 440, 684 N.E.2d at 16, 661 N.Y.S.2d at 586.

We now consider Household's appeal from the order granting summary judgment to California Union (appeal No. 1-99-3044) with respect to its policies that were issued to Household in Illinois for the period between September 1980 and January 1984.   As stated previously, these policies attached at $6 million and $11 million and required notice of an occurrence likely to involve the policy as soon as practicable.  Household sought coverage under these policies for its environmental liabilities arising at the Newcomerstown site only.  It provided notice of its claim to California Union in July 1995.  

There is no dispute that Illinois law governs the California Union policies issued to Household in Illinois.  Under Illinois law, the duty to notify an excess insurer arises when the circumstances known to the insured would have suggested to a reasonably prudent person that a possible claim or potential liability would likely implicate the excess layers of coverage.  
Tribune Co. v. Allstate Insurance Co.
, 306 Ill. App. 3d 779, 790, 715 N.E.2d 263, 271-72 (1999).  
In determining whether an insured has provided timely notice of an occurrence to its excess insurer, the insured is given some discretion in evaluating its case  (
Tribune
, 306 Ill. App. 3d at 790, 715 N.E.2d at 272),
 
and the absence of prejudice to the insurer is a factor that may also be considered (
Graham Oil
, 282 Ill. App. 3d at 141, 668 N.E.2d at 232).
  Additionally, w
here an insurer has breached an obligation to defend, principles of estoppel may bar the insurer from asserting the coverage defense of late notice. 
   
Ehlco
, 186 Ill. 2d at 152-53, 708 N.E.2d at 1135-36
.  

Applying the above principles to the present case, we conclude that Household's notice to California Union in July 1995 was late as a matter of law.  Household admits that by March 1991 it had "enough information from its investigation regarding the timing and nature of the alleged contamination" at the Newcomerstown site to determine that the contamination arose from a covered occurrence during the years California Union was on the risk.  Therefore, at least four years before it provided notice to California Union it was aware of the reasonable possibility of a claim.   Furthermore, as stated previously, Household knew that the cost estimates to meet the OEPA demand of a clean closure were as high as $44 million in 1989.  Accordingly,  the layers of coverage provided by California Union were clearly implicated six years prior to the time Household tendered its notice.  

Despite this knowledge, Household contends that the doctrine of estoppel bars California Union from asserting the late notice defense citing 
Ehlco
 in support.  Under 
Ehlco
,  the court must determine whether California Union had a duty to defend and whether it breached that duty.  "Application of the estoppel doctrine is not appropriate if the insurer had no duty to defend, or if the insurer's duty to defend was not properly triggered.  These circumstances include where the insurer was given no opportunity to defend ***."  
Ehlco
, 186 Ill. 2d at 151, 708 N.E.2d at 1135.

Household argues that the excess insurers generally had an obligation to defend if no other insurer had the right and duty to do so.  California Union maintains that estoppel is not applicable to it because its policies were excess policies which had no duty to defend.  

The insuring agreement in its policies provides:

"[T]he Company shall not be obligated to assume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the Insured, but the Company shall have the right and be given the opportunity to associate with the Insured in the defense ***."

Accordingly, based upon the specific provisions in California Union's policies, there was never a duty to defend, only a right and opportunity to defend.  Furthermore, even if there were a duty, the duty was not properly triggered here because California Union never actually had an opportunity to defend; it was not provided with notice of the OEPA suit until three years after the consent agreement, requiring Household to pay a civil penalty and perform remediation work,  had been finalized.  Moreover, that very deprivation of an opportunity to play a meaningful role in the negotiation process and remediation efforts substantially prejudiced California Union.  Therefore, the grant of summary judgment as to California Union was proper as a matter of law.

Costs 

Household next contends that the trial court erred in awarding costs to the prevailing defendants pursuant to section 5-109 of the Code (735 ILCS 5/5-109 (West 1998)) because the trial court was under the misapprehension that an award of costs was mandatory and not discretionary
 under that statute.  Defendants maintain that this court lacks jurisdiction to rule on this issue because the order awarding costs, without a determination of what costs are to be conferred, is not a final order.  A final judgment is defined as one that fixes absolutely and finally the rights of the parties in the lawsuit;  it is final if it determines the litigation on the merits so that, if affirmed, the only thing remaining is to proceed with the execution of the judgment.  
In re
 T.M.
,
 302 Ill. App. 3d 33
, 37, 706 N.E.2d 931, 934 (1998)
.  Further, an order is final where matters left for future determination are merely incidental to the ultimate rights that have been adjudicated by the order.  
In re
 T.M.
,  302 Ill. App. 3d
 at 37, 706 N.E.2d
 at 934.

Initially, we note that section 5-109 is not the proper statute to seek an award of costs relating to a grant of summary judgment.  While section 5-109 provides that costs are recoverable where authorized by statute (735 ILCS 5/5-109 (West 1998)), that section alone does not confer any right to costs.  Rather, it is section 5-110 that provides the necessary statutory authority for an award of costs in the context of summary judgment.  That section provides that a party shall recover costs if the trial court enters judgment in that party's favor upon any motion directed to the complaint.   735 ILCS 5/5-110 (West 1998).  Therefore, we consider whether the order awarding costs was final in the context of section 5-110.  See, 
e.g.
, 
Premier Electrical Construction Co. v. Morse/Diesel, Inc.
, 257 Ill. App. 3d 445, 460-62, 628 N.E.2d 1090, 1101 (1993) (applying section 5-110 to award of costs in summary judgment proceeding).

While section 5-110 states that defendant "shall recover costs," the statute does not specify precisely what constitutes "costs."  However, the legislature has granted the power to the courts to make rules under which costs may be imposed.  Section 1-105 of the Code provides that "[t]he Supreme Court may provide by rule for the orderly and expeditious administration and enforcement of this Act and of the rules, including *** the assessment of costs."  735 ILCS 5/1-105 (West 1998).   For example, under Supreme Court Rule 208(d), the expenses incurred in taking, transcribing and filing depositions may in the discretion of the trial court be taxed as costs.  134 Ill. 2d R. 208(d).  In 
Galowich v. Beech Aircraft Corp
.,  92 Ill. 2d 157, 166,  441 N.E.2d 318, 322 (1982),  the supreme court interpreted Rule 208(d) 

" 'as authorizing the trial court to tax as costs, in its discretion, the expenses only of those depositions necessarily used at trial.' "  
Gleason v. Carter
, 212 Ill. App. 3d 206, 208, 570 N.E.2d 1196, 1197-98 (1991), quoting 
Galowich
, 92 Ill. 2d at 166, 441 N.E.2d at 322.  
Thus, without knowing what specific costs defendants intend to request, we cannot make a determination of whether the trial court abused its discretion.  The general awarding of costs, without more, is not a final order; there is something left to be done.
  Accordingly, we lack jurisdiction to address the merits of this issue.

For the foregoing reasons, we affirm the circuit court's grant of summary judgment to Home, Highlands, INA, California Union, and Northbrook  as to the Newcomerstown, Ohio site, and to Home and Highlands as to the Fitchburg, Massachusetts site.  We further dismiss that portion of the appeal regarding an award of costs for lack of jurisdiction.

No. 1-99-2094, Affirmed in part; appeal dismissed in part.

No. 1-99-3044, Affirmed in part; appeal dismissed in part.

QUINN, P.J., and GREIMAN, J., concur.