[Cite as *Gerwin v. Damschroder*, 2015-Ohio-3694.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


Charles Gerwin, et al.                          Court of Appeals No. L-14-1199

     Plaintiffs                          Trial Court No. CI0200903013

v.

David A. Damschroder, et al.

     Defendants

and

Lions Club International, et al.

     Appellants

v.

ACE American Insurance                          **DECISION AND JUDGMENT**

     Appellee                          Decided:  September 11, 2015

* * * * *

W. Patrick Murray, William H. Bartle, William F. Pietrykowski
and Fritz A. Byers, for appellants.

John G. Farnan, Martha Allee and Shawn W. Maestle, for appellee.

* * * * *

**JENSEN, J.**

{¶ 1} Defendants/third-party plaintiffs-appellants are the International Association of Lions Clubs ("International Association"); Fremont Noon Lions Club; Gary Pollock; David Souder; James Moyer; Colleen Carmack; Jeff Wilson; Gregory Derodes; William Armstrong; Robert Gamble; Cynthia M. Smith, Executor of the Estate of Marie Prosser; A. Arlene Rahn-Scherf; John Schafer; Glen Zimmerman; Jeffrey Osbourne; Angela L. Chlosta, Executor of the Estate of Lowell Henry; Melvin Schafer; and Michael Reardon (collectively "appellants" or "Lions Club defendants"). Following the September 2, 2014 dismissal of the underlying lawsuit in its entirety, they appealed the March 1, 2012 judgment of the Lucas County Court of Common Pleas which denied their motion for summary judgment and granted summary judgment in favor of third-party defendant-appellee, ACE Insurance Company. For the reasons that follow, we reverse the trial court judgment and remand for further proceedings.

## I. Background

{¶ 2} On June 8, 2008, the Fremont Noon Lions Club sponsored a drive-in/fly-in pancake breakfast at Damschroder Airport in Fremont, Ohio. Attendees of the breakfast could purchase tickets for an airplane ride. Eugene Damschroder, a Lions Club member, was one of two pilots offering flights. He operated a 1968 Cessna U206C, owned by the Damschroder Trust, of which Damschroder was the trustee. William Ansted, Allison Ansted, Matthew Clearman, Danielle Gerwin, and Emily Gerwin, purchased tickets and boarded Damschroder's plane. Tragically, the plane crashed, killing all aboard.

2.

**{¶ 3}** The estates of all of Damschroder's passengers ("plaintiffs") filed actions in the Lucas County Court of Common Pleas. In their original and subsequently-amended complaints, they named as defendants David Damschroder, individually and in his capacity as executor of Eugene Damschroder's estate and successor trustee of Damschroder's trust; Damschroder Sales Company, Inc.; Jerome McTague, M.D.; and appellants. The individually-named appellants were officers or members of the Fremont Lions Club at the time of the incident.

**{¶ 4}** The plaintiffs' complaints alleged that the local club and the individually-named appellants negligently planned, prepared, promoted, managed, supervised, executed, or conducted the drive-in/fly-in breakfast; failed to have a safety officer and to complete a safety checklist; failed to file proper documentation with the FAA; and misrepresented and fraudulently advertised the fundraiser. Plaintiffs also alleged that the local club was vicariously liable for the acts of its officers and members. In their complaints, plaintiffs claimed that Damschroder was an agent, agent-by-estoppel, or joint venturer of the local club, or that he had its apparent authority, thus rendering the local club vicariously liable for Damschroder's negligent operation, use, or maintenance of the airplane.

**{¶ 5}** With respect to the International Association, plaintiffs alleged that it was independently negligent by failing to exercise reasonable care in the operation, maintenance, and entrustment of the plane; failing to supervise the local club; failing to exercise reasonable care and exposing plaintiffs' decedents to dangerous conditions;

3.

failing to revoke the charter of the local club for its practice and policy of conducting unsafe fundraising activities; misrepresenting to plaintiffs' decedents that it endorsed, supervised, participated in, and was actively involved in the local club's fundraising activities; failing to suspend Damschroder from participating in fundraising activities on behalf of the International Association or the local club; failing to implement or mandate a safety officer program for local Lions Club fundraisers; failing to implement the use of a safety checklist for local club fundraisers; failing to exercise reasonable care in planning, promoting, organizing, managing, supervising, or conducting the drive-in/fly-in breakfast; failing to file proper documents with the FAA; and failing to exercise reasonable care in advertising the local club's drive-in/fly-in fundraising breakfast.

{¶ 6} Plaintiffs also alleged that the International Association sponsored, authorized, promoted, supported, endorsed, supervised, or controlled the pancake breakfast as the local club's parent organization. They claimed that the International Association was vicariously liable for the negligent acts of the local club and the individually-named appellants, as well as Damschroder, based on principles of agency, agency-by-estoppel, apparent authority, or joint venture liability.

{¶ 7} In addition to seeking compensatory damages, plaintiffs sought punitive damages based on appellants' allegedly reckless, gross, careless, willful, or wanton misconduct which plaintiffs claimed displayed a conscious disregard for the rights and safety of others and had a great probability of causing substantial harm.

4.

{¶ 8} Appellants tendered the claim to ACE, with which the International Association maintained commercial general liability ("CGL") and umbrella insurance policies. In a series of letters, ACE denied that it owed appellants coverage or a defense. On August 26, 2010, appellants filed a third-party complaint for declaratory judgment against ACE. ACE answered and counterclaimed, seeking a declaration that it owed no duty to defend or indemnify under either policy.

{¶ 9} ACE moved for summary judgment on March 31, 2011, on the basis of the policies' aircraft exclusions. It contended that both the CGL and umbrella policies excluded coverage for injuries arising out of the ownership, maintenance, use or entrustment to others of any aircraft. It claimed that the exclusion applied regardless of the legal theory asserted by plaintiffs. ACE argued that Illinois law applied to the dispute.[1]

{¶ 10} On October 4, 2011, ACE filed a second motion for summary judgment based on its position that (1) it had no duty to defend under the CGL policy because Endorsement 20 to the policy states that ACE has no obligation to defend any claim or suit; (2) it had no duty to defend under the umbrella policy because under Endorsement 17, it had no primary or drop-down obligation to defend a claim or suit for which there is no coverage; (3) it had no duty to defend or indemnify under the umbrella policy because the activities of local Lions Clubs were excluded from coverage under Endorsements 8

---

[1] The insurance policies did not contain choice of law provisions.

and 11; and (4) it had no duty to defend or indemnify under either policy for punitive damages.

{¶ 11} Appellants filed motions for summary judgment on the coverage issues as well and they opposed ACE's motions for summary judgment. They argued that no choice of law analysis was necessary because no conflict exists between Ohio and Illinois law. They argued that under the CGL, coverage is excluded for bodily injury arising out of the ownership, use, or maintenance of an aircraft only where the aircraft was owned or operated by or rented or loaned *to any insured*. They claimed that because Damschroder was not an insured under the policy, the exclusion did not apply. They contended that even if he was an insured, the aircraft exclusion precluded coverage for an insured only if that insured owned, operated, rented, or borrowed the plane. Central to this argument was appellants' interpretation of a separation of insureds clause contained within the policy. Appellants argued that ACE ignored this provision. They also argued that the ambiguities in the policies required that they be interpreted to provide coverage.

{¶ 12} With respect to ACE's other claims, appellants contended that ACE was obligated to pay damages and defense costs once appellants exceeded the policy deductible of $1 million. They claimed that although the International Association had a $1 million deductible, the local club and its members had no deductible. They also claimed that according to Lions' insurance broker, John Adams, ACE had never asserted Endorsement 20 to avoid defense obligations and had, therefore, waived the right to enforce the provisions of the endorsement. Appellants further claimed that when ACE

6.

refused to provide a defense under the CGL policy, its duty to defend under Endorsement 17 of the umbrella policy "dropped down," requiring ACE to provide a defense under that policy.

{¶ 13} Appellants maintained that ACE ignored the fact that plaintiffs alleged independent acts of negligence unrelated to the operation, maintenance, use, or entrustment of the airplane against the International Association. They also argued that despite the endorsements disclaiming coverage for local clubs' activities, the International Association was nevertheless owed a defense under the umbrella policy because plaintiffs' complaints included allegations that the International Association was vicariously liable for its members' negligent acts. They claimed that the International Association was still owed a defense and coverage for claims brought against it for the conduct of those other clubs and their members. Finally, appellants insisted that the punitive damages exclusion did not specifically and clearly preclude coverage for an attorney fee or litigation expense award.

{¶ 14} The trial court granted summary judgment in favor of ACE on February 29, 2012, journalized the following day. To begin with, it agreed with ACE that Illinois law applied to the interpretation of the insurance contracts. It was persuaded that the aircraft exclusions applied because the plaintiffs' claims arose from the use of an aircraft "owned or operated by or rented or loaned to any insured." It concluded that Damschroder, as a member of the local Lions Club, was an "insured," and it reasoned that despite the policies' severability clauses, use of the phrase "any insured" broadened the exclusions to

7.

bar coverage for claims brought against appellants, even though none of them owned, operated, rented, or were loaned the plane. The court also found that all of plaintiffs' damages, no matter how they were characterized, were intertwined with the airplane crash. The court acknowledged appellants' argument that a jury could find that Damschroder was not an agent of the Lions Club, negating the aircraft exclusion because he would no longer be an "insured" under the policy. However, the court determined that the result would be the same because the policies' "joint venture" exclusions would apply to exclude the claims. The court declined to address whether the policies excluded coverage for punitive damages. It also did not address appellants' waiver and estoppel arguments.

{¶ 15} Appellants appealed from that decision on March 30, 2012, but we ultimately dismissed their appeal on July 24, 2012, after the trial court granted a motion for relief from judgment vacating its finding in the March 1, 2012 judgment that there was "no just reason for delay."

{¶ 16} On July 31, 2013, the individual Lions Club defendants filed a motion for summary judgment on plaintiffs' claims.[2] They argued that the airplane rides were a separate endeavor of Damschroder, and that they played no role in planning and providing the airplane rides as part of the fundraiser. They also argued that as volunteers of an unincorporated, non-profit organization, they could not be held vicariously liable

---

[2] Reardon and Prosser filed separate summary judgment motions on July 29, 2013.

8.

for Damschroder's conduct. The trial court agreed and granted summary judgment in their favor on February 6, 2014.

{¶ 17} The International Association and the Fremont Lions Club filed a separate summary judgment motion. The Fremont club argued that it never requested or invited Damschroder to offer airplane rides as part of the pancake breakfast. It maintained that the airplane rides were offered as part of a separate and unrelated business venture of Damschroder, thus it could not be held vicariously liable. The International Association argued that the Fremont club acted as an autonomous group, not subject to the supervision or control of the International Association. The court found that there was conflicting evidence about the extent to which the International Association exerted supervision and control and that there was conflicting evidence as to whether Damschroder was acting on behalf of the club in offering airplane rides. The court denied their motion for summary judgment.

{¶ 18} Plaintiffs ultimately resolved their claims against all defendants and filed a dismissal entry on August 29, 2014, journalized September 2, 2014. The March 1, 2012 order granting summary judgment to ACE became final and appealable, and appellants filed their notice of appeal of that decision on September 15, 2014. They assign the following errors for our review:

> 1. The Trial Court Erred In Finding That Third-Party Defendant, ACE, Had No Duty To Defend And/Or Indemnify Any Of The Lions

9.

Appellants Under Either Its Commercial General Liability And/Or Umbrella Policies.

2. The Trial Court Misapplied Long-Standing Ohio And Illinois Law With Respect To The Interpretation Of Insurance Contracts/Policies. The Trial Court Erred In Its Interpretation And Application Of The Separation Of Insureds Clause, In Conjunction With The Policies' Aircraft Exclusions. The Trial Court Erred In Concluding Under The Aircraft Exclusion That If One Insured Were Precluded From Coverage, All The Insureds Were Precluded From Coverage. (Interpretation of the phrase "... owned or operated by or rented to or loaned to any insured.")

3. The Trial Court Erred In Finding No Duty To Defend And/Or Indemnify The Lions Appellants' Insureds At The Time Of The 6-8-08 Crash Since A Question Of Fact Existed As To Whether Eugene Damschroder Was An "Insured".

4. The Trial Court Erred In Finding No Duty To Defend Or Pay Defense Costs Above The Deductible Under The Commercial General Liability Policy. The Third Party Insureds Were Entitled To A Defense Based Upon The Policy Language And/Or The Past Practices/Course Of Conduct Of ACE. Even If There Was No Duty To Defend Under The Commercial General Liability Policy, A Duty To Defend Existed Under

The Umbrella Policy For The International If The Insured Losses Exceeded The Insureds' Retained Limit Of One Million Dollars.

## II.  Standard of Review

{¶ 19} Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996), employing the same standard as trial courts.  *Lorain Natl. Bank v. Saratoga Apts.,* 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989).  The motion may be granted only when it is demonstrated:

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.  *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 20} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).  When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but

must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826, 675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 201 (1986).

### III. Analysis

{¶ 21} For the most part, appellants' arguments on appeal mirror those they made in their summary judgment briefing. They contend that the policies' aircraft exclusions are not applicable because none of them owned, operated, rented, or borrowed the plane as required for the exclusions to apply. They claim that under the separation of insureds clauses in the policies, plaintiffs' claims of negligence must be evaluated individually as to each appellant as if each of them had been issued a separate insurance policy. Appellants allege that the potentially applicable provisions of the policy are ambiguous and should be interpreted against ACE.

{¶ 22} Appellants also argue that ACE cannot avoid coverage and defense under the policies because Damschroder was not an "insured," as demonstrated by the trial court's finding that there was a question of fact as to whether Damschroder was providing airplane rides independent of the drive-in/fly-in breakfast. If he was not acting

12.

in his capacity as a member of the Lions Club, they argue, he would not be an "insured" and the aircraft exclusions would not apply.

{¶ 23} With respect to the CGL policy, appellants argue that because the deductible amount was exceeded, ACE became obligated to pay defense costs. They submit that ACE's practice was to provide a defense and that this case is the only case where it declined to do so. They contend that the doctrines of waiver and estoppel preclude ACE from avoiding defense costs in this case given their established practice. With respect to the umbrella policy, they claim that part C, section (b) requires ACE to defend once the insured's retained limit of $1 million has been reached—an event which they say has occurred. They claim that once ACE denied a duty to defend under the CGL policy, the duty to defend under the umbrella policy "dropped down," making ACE responsible for their defense upon exceeding the $1 million retained limit.

{¶ 24} The trial court concluded that Illinois law applies to the interpretation of the ACE policies and no party appealed that ruling. Under Illinois law, "the construction of an insurance policy is a question of law subject to *de novo* review." *State Farm Mut. Ins. Co. v. Villicana*, 181 Ill.2d 436, 442, 692 N.E.2d 1196 (1998), citing *Am. States Ins. Co. v. Koloms,* 177 Ill.2d 473, 479-80, 687 N.E.2d 72 (1997). In construing policy language, a court must ascertain and give effect to the parties' intentions as expressed in their agreement and read as a whole.[3] *Id.* If the terms are clear and unambiguous, they

---

[3] Significantly, the Illinois Supreme Court has since held that "a circuit court may, under certain circumstances, look beyond the underlying complaint in order to determine an

13.

must be afforded their plain and ordinary meaning. *Id.* If, however, the terms are susceptible to more than one meaning, they are considered ambiguous and will be construed strictly against the insurer. *Id.* To that end, provisions that limit or exclude coverage must be interpreted liberally in favor of the insured. *Id.*

{¶ 25} We begin by discussing ACE's obligations under the CGL policy.

### A. The CGL Policy

### 1. Does The CGL Aircraft Exclusion Apply?

{¶ 26} Before answering the question of whether the aircraft exclusion in the CGL policy applies, we must identify who was insured under the policy. The CGL policy was issued to "The International Association of Lions Clubs, ETAL." Endorsement 1 to the policy defines "insured" to include the International Association of Lions Clubs, as well as all individual Lions Clubs organized or chartered by the Association. Section (B)(1) of the endorsement specifies that "insured" includes "any director, officer or employee thereof while acting within the scope of his duties as such, and individual Lion members * * * while acting in their capacity as such or while acting on behalf of a named insured."

{¶ 27} The Fremont club was chartered by the International Association and the complaints allege that the individual appellants were acting in their capacity as officers and members of the local club, thus all appellants are insureds under the CGL policy.

---

insurer's duty to defend." *Pekin Ins. Co. v. Wilson*, 237 Ill.2d 446, 459, 930 N.E.2d 1011 (2010).

14.

The question with respect to the applicability of the aircraft exclusion is whether *Damschroder* was an "insured."

{¶ 28} Section I(2) of the policy sets forth the policy's exclusions. Provision (g) excludes coverage for the following:

> Aircraft, Auto Or Watercraft
>
> "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft * * * owned or operated by or rented or loaned to *any insured*. Use includes operation and "loading or unloading". (Emphasis added.)
>
> This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft * * * that is owned or operated by or rented or loaned to any insured.

{¶ 29} ACE claims that because Damschroder was a member of the Fremont Lions Club, he was an "insured," and because the plane was owned, operated, rented, or loaned to him, the aircraft exclusion bars coverage. Appellants claim that Damschroder was not acting in his capacity as a Lions Club member at the time of the plane crash, thus he was not an "insured" for purposes of the aircraft exclusion. The trial court agreed with

ACE that as a Lions Club member, Damschroder was an "insured," and the exclusion was properly asserted by ACE.

{¶ 30} As appellants point out, a Lions Club member is an "insured" under Endorsement 1, section (B)(1) only "while acting in their capacity as such or while acting on behalf of a named insured." In other words, Damschroder would not be an "insured" if he was engaging in a separate and unrelated business endeavor. The trial court in its February 6, 2014 decision denying the clubs' motions for summary judgment, held that there were genuine issues of material fact as to whether Damschroder was acting in a separate and unrelated business endeavor at the time of the plane crash. This factual question was never resolved in the trial court because the parties to the wrongful death action reached a global settlement before the case went to trial. We agree with appellants that depending on how that factual issue is resolved, the plane crash may not have arisen out of "the ownership, maintenance, use or entrustment to others of any aircraft * * * owned or operated by or rented or loaned to *any insured,*" and the aircraft exclusion may not apply.

{¶ 31} ACE argues that in the event that Damschroder is found to have been acting in a separate and unrelated business endeavor, the clubs would have no liability and there would be no loss to indemnify. It also argues that if the aircraft exclusion does not apply to bar coverage for Damschroder's conduct because he lacks "insured" status, coverage is nonetheless barred under Section II(3) because the airplane rides were offered by Damschroder as part of a joint venture with the Fremont Lions Club. Section II(3) of

16.

the CGL policy provides: "No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations."

{¶ 32} Appellants counter that in addition to arguing that Damschroder acted with the actual authority of the club, plaintiffs alleged that Damschroder acted with apparent authority, and they also asserted agency-by-estoppel theories. As these multiple theories were pled, appellants claim that they would still be entitled to coverage under the CGL policy because Damschroder would qualify neither as an insured nor as a joint venturer.

{¶ 33} The trial court was persuaded by ACE's position that if Damschroder was not an "insured" for purposes of the aircraft exclusion, the joint venture exclusion applied. But we agree with appellants that there are statuses other than "insured" or "joint venturer" that could subject them to liability for Damschroder's conduct. We also find that questions of fact must be resolved in determining whether Damschroder and appellants were engaged in a joint venture.

{¶ 34} Under Illinois law, a joint venture is "an association of two or more persons to carry out a single enterprise for profit." (Internal citations and quotations omitted.) *Powell v. Dean Foods Co.*, 2013 Ill.App. No. 082513-B, 7 N.E.3d 675, ¶ 76 (1st Dist.). "[T]he existence of a joint venture may be inferred from the circumstances and does not require a formal agreement." *Id.,* citing *Thompson v. Hiter,* 356 Ill.App.3d 574, 582, 826 N.E.2d 503 (1st Dist.2005). In determining whether a joint venture exists, the following factors must be found: "(1) a community of interest in the purpose of the joint

17.

association; (2) a right of each member to direct and govern the policy or conduct of the other members; (3) a right to joint control and management of the property used in the enterprise; and (4) a sharing in both profits and losses." *Id.*

{¶ 35} Whether a joint venture exists is ordinarily a question of fact. *O'Brien v. Cacciatore,* 227 Ill.App.3d 836, 843, 591 N.E.2d 1384 (1st Dist.1992). In its decision, the trial court summarily concluded that if Damschroder was not an "insured," then the joint venture exclusion applied. We find that Damschroder's status as an "insured" or a joint venturer required a factual determination that was never made.

{¶ 36} Turning to the other relationships alleged by plaintiffs, Illinois recognizes both apparent authority and agency-by-estoppel. "Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf." *N. Trust Co. v. St. Francis Hosp.*, 168 Ill.App.3d 270, 278, 522 N.E.2d 699 (1st Dist.1988). "To prove apparent agency, one must establish: (1) the principal's consent to or knowing acquiescence in the agent's exercise of authority, (2) the third person's knowledge of the facts and good-faith belief that the agent possessed such authority, and (3) the third person's reliance on the agent's apparent authority to his or her detriment." *Id.,* citing 3 American Jurisprudence 2d, Agency, Section 80 (1986).

{¶ 37} "Estoppel to deny the existence of an agency relationship also requires a holding out" as one's agent that is calculated to mislead and which an ordinarily prudent person would have considered as "consistent only with the fact that the designated party

18.

was an agent." *Salisbury v. Chapman Realty*, 124 Ill.App.3d 1057, 1062, 465 N.E.2d 127 (3d Dist.1984), citing *Crittendon v. State Oil Co.*, 78 Ill.App.2d 112, 116, 222 N.E.2d 561 (2d Dist.1966).

{¶ 38} Unless the parties' relationship is undisputed, the existence and scope of an agency relationship are questions of fact. *Lang v. Consumers Ins. Serv., Inc.,* 222 Ill. App.3d 226, 240, 583 N.E.2d 1147, 1157 (2d Dist.1991), citing *Milwaukee Mut. Ins. Co. v. Wessels*, 114 Ill.App.3d 746, 749, 449 N.E.2d 897 (2d Dist.1983). Again, these factual questions were not resolved in the trial court. Additionally, the record is not developed as to whether Damschroder would still be deemed an "insured" if he acted with the apparent authority—but not the *actual* authority—to act on behalf of the clubs. This matter must be remanded for resolution of these issues.

## 2. The Separation of Insureds Clause

{¶ 39} In addition to arguing that Damschroder was not an "insured" under the circumstances of this case, appellants also argue that applying the separation of insureds provision contained in the policy (also referred to as a "severability clause"), the policy must be read as though each insured had been issued his, her, or its own separate policy. As such, they argue, the exclusion for claims arising out of "the ownership, maintenance, use or entrustment to others of any aircraft * * * owned or operated by or rented or loaned to *any insured,*" would apply only to the extent that the individual seeking coverage owned, operated, rented, or borrowed the aircraft. In other words, if Pollock, for instance, was seeking coverage under the policy, the exclusion would apply only if

19.

the aircraft was owned or operated by or rented or loaned to *Pollock*. The exclusion would not apply if the aircraft was owned or operated by or rented or loaned to any of the other insureds.

{¶ 40} Although the trial court concluded that Illinois law applies to the interpretation of the ACE policies, the court nevertheless cited both Ohio and Illinois law in its summary judgment decision. It cited our decision in *Bennett v. Waidelich*, 6th Dist. Fulton No. F-04-023, 2005-Ohio-2489, and an Illinois appellate court case, *Allstate Ins. Co. v. Smiley,* 276 Ill.App.3d 971, 659 N.E.2d 1345 (2d Dist.1995).

{¶ 41} In *Bennett,* the appellant was injured in a car accident while a passenger in a vehicle that was owned and operated by appellee's 19-year-old son. She sued appellee's son for negligence and sued appellee for contributory negligence for permitting her underage son to consume alcohol in her home, failing to supervise or exercise reasonable control over him, and entrusting him with a dangerous instrumentality—his vehicle—when she should have known he was intoxicated. Appellant settled with appellee's son and dismissed her negligence claims against him. Her claims against appellee remained.

{¶ 42} Appellee had a homeowners' insurance policy through State Farm, but State Farm denied coverage. Appellant sought a declaration that the State Farm policy provided coverage for appellee's alleged negligence. Appellee asserted a number of defenses against appellant's claims, but she also argued that State Farm did not provide coverage for her alleged negligence. The policy contained an exclusion for "bodily

20.

injury or property damage arising out of the ownership, maintenance, use, loading or unloading of * * * a motor vehicle owned or operated by or rented or loaned to any insured; * * * [and] bodily injury or property damage arising out of:

(1) The entrustment by any insured to any person;

(2) The supervision by any insured to any person;

(3) Any liability statutorily imposed on any insured;

(4) Or any liability assumed through an unwritten or written agreement by any insured;

With regard to the ownership, maintenance or use of any * * * motor vehicle which is not covered under Section II of this policy * * *.

{¶ 43} "Insured" was defined to include "you and, if residents of your household: (a) your relatives; and (b) any other person under the age of 21 who is in the care of a person described above." Appellee and her husband were the named insureds under the policy and their son lived with them. We found that because appellant's injuries arose out of appellee's son's ownership and operation of a motor vehicle, there was no coverage. Because the claims against appellee were so inextricably intertwined with her son's use of his motor vehicle, we found that coverage was excluded for her actions as well. We reached this conclusion despite a severability clause that provided that the insurance applied separately to each insured. We rejected appellant's argument that appellee's actions were separate and distinct from the ownership, maintenance, use, loading or unloading of the vehicle.

21.

{¶ 44} In *Smiley,* 276 Ill.App.3d 971, 659 N.E.2d 1345, the appellants purchased a homeowners' policy from Allstate. Mrs. Smiley provided daycare services in her home and purchased an umbrella policy because she wanted coverage for her expanding daycare business. While caring for a child, the child fell into appellants' swimming pool and drowned. The child's estate sued appellants on the basis of Mrs. Smiley's negligent acts and her husband's negligent failure to properly maintain the premises. Allstate defended appellants under a reservation of rights, but sought a declaration that its policies provided no coverage and that it was not obligated to defend or indemnify appellants in the personal injury action.

{¶ 45} The homeowners' policy provided an exclusion for "bodily injury or property damage arising out of the past or present business activities of an insured person." The umbrella policy stated that "activities related to any business or business property of any Insured are not covered." It also excluded occurrences "arising out of a business or business property."

{¶ 46} The court held that the policy did not apply to the claims against Mrs. Smiley because those claims arose out of business activities, regardless of how her actions were characterized. As to her husband, it found that the claims against him were also not covered because under the homeowners' policy, coverage was expressly excluded for injuries arising out of the business activities of "*an insured person.*" Under the umbrella policy, coverage was expressly excluded for injuries arising from the business activities of "*any Insured.*" The court explained that "an" is an indefinite article

22.

and is applied to more than one individual object, and "use of the phrase 'an insured' in an exclusionary clause unambiguously means 'any insured.'" The court determined that "an" and "any" "broadened the exclusions to include injuries triggered by one insured in connection with the business activities of another insured." It added that its conclusion would have been different if the phrase "the insured" had been used. In that case, it would likely have found that coverage existed as to Mr. Smiley.[4]

{¶ 47} There is no indication that the policies in *Smiley* contained a separation of insureds clause. *Archer Daniels Midland Co. v. Burlington Ins. Co. Group, Inc.,* 785 F.Supp.2d 722 (N.D.Ill.2011), is instructive in that regard, however. There the court was concerned with two clauses: (1) an employer's liability exclusion, which excluded coverage for bodily injury to an employee of "the insured" injured in the course of his employment or while performing duties relating to the insured's business; and (2) a cross-liability exclusion, which provided that the insurance did not apply to injuries to a present, former, future, or prospective partner, officer, director, stockholder, or employee of "any insured." The policy contained a separation of insureds clause similar to the one at issue here. While the court, applying Illinois law, found that the employer liability exclusion did not bar coverage in a suit brought by one insured's employee against an additional insured under the subject insurance policy, it reached the opposite conclusion

---

[4] Ultimately the court found that there was a genuine issue of material fact as to whether Allstate was estopped from denying coverage based on appellants' testimony that she told her Allstate insurance agent that she was adding the umbrella policy to provide extra coverage for the risks involved in running her daycare.

with respect to the cross-liability exclusion. Based on the cross-liability exclusion, the court found no coverage under the policy.

{¶ 48} In reaching that determination, the court recognized that "the majority rule is that the distinction between the terms 'the insured' and 'any insured' in an exclusion is crucial in determining the import of a severability clause." *Id.* at 733. More specifically, it recognized that a severability clause has no impact on exclusions pertaining to "any insured." *Id.*, citing *Nautilus Ins. Co. v. K. Smith Builders, Ltd.,* 725 F.Supp.2d 1219, 1227-30 (D.Haw.2010). In *Archer Daniels*, the court found that use of the term "any insured" in the cross-liability exclusion unambiguously expressed a contractual intent "to create joint obligations and preclude coverage to innocent co-insureds." *Id.* at 734.

{¶ 49} Appellants urge that Justice Cupp's concurring opinion in *Safeco Ins. Co. of Amer. v. White,* 122 Ohio St.3d 562, 2009-Ohio-3718, 913 N.E.2d 426, properly concluded that "the term 'any insured' used in defining the exclusions in the umbrella policy is ambiguous when read in conjunction with the policy's severability clause." *Id.* at ¶ 55. We observe, however, that (1) the majority declined to review this issue; (2) Justice O'Donnell took a differing view in his dissenting opinion and explained instead that "[t]he phrase 'any insured,' * * * makes the exclusion applicable to *all* insureds whenever any one of them has committed the prohibited act," despite the inclusion of a severability clause; and (3) the trial court concluded that Illinois law applies and no party appealed that aspect of the court's decision. *Id.* at ¶ 62, 72-73.

24.

**{¶ 50}** Related to this, appellants also claim that the ambiguity of the provision is demonstrated by the fact that different courts and different justices within the same courts have reached differing conclusions as to whether an exclusion is applicable to all insureds despite the inclusion of a severability clause. In that case, they argue, we can look to extrinsic evidence, which would include consideration of the testimony of insurance broker, John Adams, who testified that this is the only case where ACE has declined to provide a defense.

**{¶ 51}** First, we note that a contract provision is not ambiguous merely because various courts have interpreted it differently. *See, e.g., Outboard Marin Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 114-115, 607 N.E.2d 1204 (1992) (recognizing that federal and state courts had considered the term "damages" in CGL policies and reached different conclusions as to its ambiguity or lack thereof). Here, while we recognize that not all courts are uniform in their interpretation of the effect of a severability clause on an exclusion based on the conduct of "any insured," we disagree with appellants that the policy is ambiguous in this regard.

**{¶ 52}** Finally, appellants claim that "that insured" as used in the second paragraph of the aircraft exclusion refers to a single specific insured. They contend that use of the terms "that insured" *and* "any insured," within the same provision demonstrates the intent that those terms be used interchangeably. They argue that ACE should have made it clear if it did not intend those terms to be used interchangeably. They maintain that its failure to do has resulted in ambiguity. We find no ambiguity.

25.

{¶ 53} Again, the provision excluded from the insurance claims for:

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft * * * owned or operated by or rented or loaned to *any insured*. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against *any insured* allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by *that insured*, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft * * * that is owned or operated by or rented or loaned to *any insured*. (Emphasis added.)

{¶ 54} Use of "that insured" in the second paragraph in reference to a single insured has no effect on the policy's exclusion for injuries caused by an aircraft owned or operated by "any insured." If anything, it evidences the deliberateness of the drafter to broaden the exclusion. What is more, it makes clear that the theories of liability asserted against appellants—negligent hiring, negligent entrustment, failure to supervise, negligent advertising, failure to comply with Federal Aviation standards, and failure to implement a safety officer—are also excluded from coverage.

### 3. Did Endorsement 20 Relieve ACE of the Duty to Defend?

{¶ 55} Generally speaking, an insurer's duty to defend is broader than the duty to indemnify. *Pekin Ins. Co.,* 237 Ill.2d at 455, 930 N.E.2d 1011. In determining whether

an insurer owes a duty to defend, a court "ordinarily looks first to the allegations in the underlying complaint and compares those allegations to the relevant provisions of the insurance policy. If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises." (Internal citations omitted.) *Id.* Unless it is clear from the face of the underlying complaint that the allegations do not state facts which bring the case within, or potentially within, the policy's coverage, the insurer may not justifiably refuse to defend its insured. *U.S. Fid. & Guar. Co. v. Wilkin Insulation Co.,* 144 Ill.2d 64, 73, 578 N.E.2d 926 (1991). This is true even if the allegations are groundless, false, or fraudulent. *Am. Econ. Ins. Co. v. DePaul Univ.*, 383 Ill.App.3d 172, 177-78, 890 N.E.2d 582 (1st Dist.2008), citing *Northbrook Property & Cas. Co. v. Transp. Joint Agreement,* 194 Ill.2d 96, 98, 741 N.E.2d 253 (2000).

{¶ 56} Despite these general principles, ACE contends that the CGL is an indemnity-only policy and that Endorsement 20 to the CGL negates its duty to defend appellants. It also claims that if it is not obligated to pay a judgment or settlement due to the absence of a covered claim, by extension, it is not obligated to reimburse any portion of appellants' defense costs.

{¶ 57} Appellants assert that under the language of the endorsement, ACE is relieved of reimbursing it only for defense costs within the deductible amount—$1 million. Once the deductible has been exhausted, as they allege is the case here, appellants urge that they are entitled to reimbursement of defense costs.

27.

**{¶ 58}** Endorsement 20 provides for a $1 million deductible per occurrence. Section 2 of the endorsement provides:

> You and we mutually agree that the Claims Service Organization shown in the Schedule will provide investigation, administration, adjustment, and settlement services, and will provide for the defense of all claims or "suits" arising under this policy. *Accordingly, you agree with us that we shall not have any duty to defend any such "suit", nor to pay any "allocated loss adjustment expenses" within the Deductible amounts with respect to any claim or "suit", except as provided in paragraph 4, below.* (Emphasis added.)

**{¶ 59}** Under paragraph 4:

> All "allocated loss adjustment expenses" shall be apportioned between you and us as follows:
>
> a. If the amount of the judgment or settlement exceeds the amount of the Deductible Per Occurrence, all such "allocated loss adjustment expenses" *shall be borne by you and us in the same proportion as your and our respective obligations under this policy for payment of the amount of judgment or settlement*. The amount of such "allocated loss adjustment expenses" borne by you shall not contribute to the exhaustion of the Annual Deductible Aggregate.

28.

b. *If the amount of the judgment or settlement does not exceed the amount of the Deductible Per Occurrence, or if the claim or "suit" is settled without payment of damages, the amount of such "allocated loss adjustment expenses" shall be borne solely by you.* The amount of such "allocated loss adjustment expenses" borne by you shall not contribute to the exhaustion of the Annual Deductible Domestic Aggregate. (Emphasis added.)[5]

{¶ 60} Appellants argue that *Omega Flex, Inc. v. Pacific Employers Ins. Co.,* 78 Mass.App.Ct. 262, 937 N.E.2d 52 (2010) demonstrates that reimbursement is required

---

[5] "Allocated loss adjustment expenses," ("ALAE"), is defined in Endorsement 20 to include:

[E]xpenses, costs, and interest provided for under Section 1 – Coverages, Supplementary Payments – Coverages A and B of this policy, or any other expenses, costs, or interest incurred in connection with the investigation, administration, adjustment, settlement or defense of any claim or "suit" arising under this policy, which the Claims Service Organization shown in the Schedule, under its accounting practices, directly allocates to a particular claim, whether or not a payment indemnifying the claimant(s) is made. Such expenses include, but are not limited to, subrogation, all court costs, fees and expenses; fees for service of process; fees and expenses to attorneys for legal services; the cost of services of undercover operations and detectives; fees to obtain medical cost containment services; the cost of employing experts for the purpose of preparing maps, photographs, diagrams, and chemical or physical analysis, or for expert advice or opinions; the cost of obtaining copies of any public records; and the cost of obtaining depositions and court reporters or recorded statements. "Allocated loss adjustment expense" shall not include the salaries of our employees, overhead, adjusters' fees, the Claims Service Organization Employees or any Potential Claims Service Organization employees.

29.

once the policy deductible has been exceeded. In *Omega Flex,* the insurer argued that its duty to defend was tied to its duty to indemnify. Its policy provided:

>    2. You have entered into an agreement with the claim service organization shown in the Schedule (the 'Claim Service Organization'), whereunder the Claim Service Organization shall provide investigation, administration, adjustment, and settlement services, and shall provide for the defense of all claims or 'suits' arising under this policy. Accordingly, you agree with us that we shall not have any duty to defend any such 'suit,' or to pay with respect to any claim or 'suit' any ALAE within the Deductible amounts. *Id.* at 269.

{¶ 61} The court concluded that the effect of the provision was to require the insurer to indemnify and pay damages once the insured exceeds its deductible endorsement. Id. at 270. It held that the policy language "reiterate[d] that once the deductible amount was reached, [the insurer's] duty to pay defense costs under the policy was triggered."

{¶ 62} ACE cites *Air Liquide Amer. Corp. v. Continental Cas. Co.*, 217 F.3d 1272 (10th Cir.2000) for the proposition that it is not obligated to reimburse defense costs. The policy in Air Liquide provided:

>    You have entered into an agreement with the claim service organization shown in the Schedule (the "*Claim Service Organization* "), whereunder the Claim Service Organization shall provide investigation,

30.

administration, adjustment, and settlement services, and shall provide for the defense of all claims or "suits" arising under this policy.  Accordingly, you agree with us that we shall not have any duty to defend any such "suit," or to pay with respect to any claim or "suit" any ALAE [Allocated Loss Adjustment Expense].  *Id*. at 1280.

{¶ 63} The court found for the insurer and held that the policy expressly disclaimed a duty to defend.  *Id.*

{¶ 64} *Tribune Co. v. Allstate Ins. Co*., 306 Ill.App.3d 779, 785, 715 N.E.2d 263 (1st Dist.1999) is analogous to *Air Liquide*.  Like the *Air Liquide* policy, the policy in *Tribune* provided that the insurer "has no obligation to pay or contribute to any 'Loss Adjustment Expense.'  Rather, the Named Insured shall pay all such expenses." *Id.* at 784.

{¶ 65} The *Air Liquide* and *Tribune* policies omit an important phrase contained in both the *Omega Flex* policy and the ACE policy:  *"within the Deductible amounts."*  This is a significant distinction.

{¶ 66} Although the trial court recognized ACE's contention that the policy provided for indemnity only, and not for a defense, and cited *Tribune,* it avoided any substantive discussion of this endorsement by concluding, simply, that the aircraft exclusion barred both indemnity and defense.[6]

---

[6] The trial court cited *Tribune* for the proposition that under Illinois law, indemnity-only policies are enforceable as written.

31.

{¶ 67} The trial court rendered its coverage decision on March 1, 2012. ACE represented in its October 4, 2011 brief in support of its motion for summary judgment on the coverage issue that the $1 million deductible had not been exceeded. However, litigation continued for over two years following the coverage decision, presumably resulting in additional defense costs, and a settlement was reached between plaintiffs and appellants. We do not know the details of that settlement, whether appellants contributed to that settlement, or how much they contributed. Appellants in their brief on appeal assert that the $1 million deductible has been exceeded, but the lower court record is not developed as to this point due to the trial court's conclusion that the aircraft exclusion barred coverage. Thus, depending on how the court resolves the issue of whether Damschroder was an "insured," it will be necessary for the trial court to determine the parties' respective obligations for damages and defense costs, if any, under Endorsement 20.

{¶ 68} Appellants argue that regardless of ACE's position here that it had no duty to defend, its past practice had been to accept the defense of claims the appellants had submitted to it. They claim that Adams' deposition testimony indicates that this is the only case they have tendered where ACE relied on Endorsement 20 to avoid providing a defense. They claim that the endorsement has been waived and that ACE is estopped from asserting it. ACE counters that appellants failed to plead waiver and that the plain language of the endorsement controls.

32.

{¶ 69} Under section 5 of the endorsement, ACE retains the right at its sole discretion:

a. To pay any damages under this policy within The Deductible Per Occurrence or in excess of the Excess Of Deductible Aggregate Limit should you fail to pay any final judgment against or settlement entered into by an insured;

b. To pay any amounts within the Deductible Per Occurrence or in excess of the Excess Of Deductible Aggregate Limit to settle any claim or "suit";

c. To assume the defense and control of any claim or suit seeking payment of damages under this policy that we believe will exceed the Deductible Per Occurrence or Excess Of The Deductible Aggregate Limit; and

d. To pay any "allocated loss adjustment expense" incurred by us associated with a., b., or c. above. You shall promptly reimburse us for any sums we may have paid under item 5.

{¶ 70} Under Illinois law, an insurer may in certain circumstances be found to have waived a policy exclusion or may be estopped from asserting an applicable exclusion. *See generally The Hartford v. Doubler*, 105 Ill.App.3d 999, 1002, 434 N.E.2d 1189 (3d Dist.1982); *RLI Ins. Co. v. Illinois Natl. Ins. Co.*, 335 Ill.App.3d 633, 647, 781 N.E.2d 321 (1st Dist.2002). Depending on the trial court's determination of the

33.

preceding issues, it may be necessary to consider whether such circumstances exist in this case.

## B. The Umbrella Policy

{¶ 71} In addition to the CGL policy, the International Association maintained an umbrella insurance policy with ACE with limits of $25 million and a retained limit of $1 million. That policy provides that ACE will be liable for occurrences within its coverage for losses in excess of the limits of the underlying insurance—which includes the CGL— or, if no underlying insurance exists, the greater of the limits of liability of (1) "other insurance," a defined term in the policy, or (2) the insured's retained limit.

{¶ 72} Under the defense provisions of the umbrella policy, which were amended by Endorsement 17, for occurrences covered by underlying or other insurance, ACE "shall not be called upon to assume charge of the investigation, settlement or defense of any suit brought against the INSURED," but it nevertheless retains the right to be associated with the defense. ACE owes the obligation to defend the insured where an occurrence is not covered by underlying or other insurance, but is "covered by the terms and conditions" of the umbrella policy, and the insured losses exceed the insured's retained limit.

{¶ 73} As it did with the CGL policy, the trial court held that the umbrella policy's aircraft exclusion barred coverage under the policy. It quoted from the exclusion:

This insurance does not apply:

A. Except insofar as coverage is available to the INSURED in the UNDERLYING INSURANCE and for the full limits of liability shown therein, to

\* \* \*

4. Liability arising out of the ownership, maintenance, operation, use, entrustment to others, LOADING OR UNLOADING of:

(a) Aircraft

{¶ 74} But the court failed to address Endorsement 10 of the policy, which amends this provision to add the following:

This exclusion applies even if the claims against any INSURED allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that INSURED, if the occurrence which caused the BODILY INJURY or PROPERTY DAMAGE involved the ownership, maintenance, use or entrustment to others of any aircraft or watercraft that is owned or operated by or rented or loaned to any INSURED.

{¶ 75} The aircraft exclusion as it appears in the body of the policy is relatively straightforward and excludes claims arising out of the ownership, maintenance, operation, use, or entrustment of an aircraft, regardless of who owned, operated, rented, or borrowed it. Endorsement 10, however, operates to narrow the exclusion qualifying it

so that it applies only where the aircraft is owned, operated by, rented, or loaned to *any insured*—similar to the exclusion in the CGL policy.  As with the CGL policy, whether the exclusion applies depends on whether Damschroder was an "insured."

{¶ 76} What is more, because it found simply that the aircraft exclusion applied, the trial court did not undertake an analysis of who is insured under the umbrella policy. Under Endorsement 8 to the policy, the insurance "does not apply to any liability arising out of the premises, operations, products or activities of any person or organization shown in the schedule:  State, *Local* And Foreign *Lions Clubs*."  (Emphasis added.)  In addition, Endorsement 11 specifies that the policy "only applies to liability arising out of the operations of the following entities:  1. The International Association Of Lions Clubs[; and] 2. Lions Clubs International Foundation * * *."

{¶ 77} Endorsements 8 and 11 make clear that the local Lions club is not an insured under the policy.  A couple of things are less clear, however.  For one, although the policy states that it does not apply to liability arising out of the activities of a local club, plaintiffs' complaints allege that the fundraiser was a joint undertaking between the International Association and the local club.  If that is the case, it could be argued that the activities of the International Association were actually at issue.  Second, Endorsement 10 of the policy provides that the International Association's volunteer workers are insureds.  "Volunteer worker" is defined in the endorsement as "a person who is not your EMPLOYEE, and who donates his or her work and acts at the direction of and within the scope of duties determined by YOU, and is not paid a fee, salary, or other compensation

36.

by YOU or anyone else for their work performed for you." If the fundraiser was not an activity of the International Association, Damschroder would not be an "insured" under the policy, and the aircraft exclusion—as amended by Endorsement 10–may not apply. If it was an activity of the International Association, it must be determined whether Damschroder and the individual appellants were "volunteer workers."

{¶ 78} These are all issues that the court must address and it must do so in the context of when a duty to defend arises, taking into consideration its determinations pertinent to the applicability of the CGL policy and its effect on triggering the umbrella policy.

{¶ 79} Applying the above determinations to appellants' assignments of error, we find their second assignment of error not well-taken. We find their remaining assignments of error well-taken.

## IV. Conclusion

{¶ 80} In addition to presenting issues of law for the court's determination, this case involves a number of factual questions that need to be resolved before determining who is insured under the policies, whether the aircraft exclusions apply, whether the policies' retained limits have been exceeded, and whether a duty to defend exists. The resolution of those factual questions may affect the interplay between the CGL and umbrella policies. We, therefore, remand this matter for further proceedings. With respect to the CGL, the following must be determined:

37.

1. Whether Damschroder was acting on behalf of the International Association and/or the Fremont Noon Lions Club;

2. If not, and the aircraft exclusion is rendered inapplicable, whether the CGL's deductible was exceeded and whether other terms in Endorsement 20 trigger ACE's obligation to share in allocated loss adjustment expenses; and

3. Whether there is any merit to appellants' waiver and estoppel arguments.

{¶ 81} For purposes of the umbrella policy, the following must be considered:

1. ACE's potential defense obligations should the CGL be found to exclude coverage;

2. Whether the allegations in plaintiffs' complaints trigger ACE's defense obligations;

3. Whether the fundraiser was an activity of the International Association, or whether it was solely a local club activity;

4. If it was an activity of the International Association, whether Damschroder was a "volunteer worker" of the International Association, and whether the individual appellants were volunteer workers; and

5. Whether the retained limit has been exceeded.

{¶ 82} To the extent other issues, not specified above, arise as a result of the trial court's determinations, those issues should also be addressed by the trial court as

38.

appropriate.  This could include issues such as whether other statuses potentially attributable to Damschroder (e.g., apparent agent, agent-by-estoppel, etc.) affect coverage, and the parties' arguments with respect to coverage for punitive damages.  In turn, other issues previously identified in our decision may be rendered moot as the trial court's analysis develops.

{¶ 83} Accordingly, we reverse the March 1, 2012 judgment of the Lucas County Court of Common Pleas and remand for proceedings consistent with this decision.  The costs of this appeal are assessed to ACE pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                 _____
                                              JUDGE
Stephen A. Yarbrough, P.J.      

James D. Jensen, J.            _____
CONCUR.                                         JUDGE

_____
                                              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.